421 F.2d 39
 PHILIPS ELECTRONICS & PHARMACEUTICAL INDUSTRIES CORP., a Corporation of the State of Maryland
v.
William B. LEAVENS, Jr., and Greene Datatape, Inc., a Corporation of the State of New Jersey.
William B. Leavens, Jr., Appellant in No. 17699,
Greene Datatape, Inc., a Corporation of the State of New Jersey, Appellant in No. 17700.
 No. 17699.
 No. 17700.
 United States Court of Appeals Third Circuit.
 Argued September 25, 1969.
 Decided January 13, 1970.
 
 Sheldon A. Weiss, Glauberman & Weiss, Jersey City, N. J., (Isadore Glauberman, Jersey City, N. J., on the brief), for appellants.
 Joel D. Siegal, Hellring, Lindeman & Landau, Newark, N. J. (Bernard Hellring, Stephen H. Roth, Newark, N. J., on the brief), for appellee.
 Before HASTIE, Chief Judge, and McLAUGHLIN and VAN DUSEN, Circuit Judges.
 OPINION OF THE COURT
 VAN DUSEN, Circuit Judge.
 
 
 1
 This case is before the court on the appeals (1) of the corporate defendant (No. 17700) from a District Court Judgment of October 18, 1968, awarding damages for anticipatory breach of a contract for the manufacture and repair of mechanical devices known as Letteriters[1] attached to I.B.M. electric typewriters and dismissing its counterclaim alleging breach of warranty, misrepresentation, and negligence by plaintiff; and (2) of the individual defendant (No. 17699) from a District Court judgment entered October 18, 1968, against him on guarantees of performance of the contract and dismissing the counterclaim which had been filed by him, as well as by the corporate defendant.[2]
 
 
 2
 The District Court opinion uses this language in describing the background of the contract:
 
 
 3
 "Datatape [the corporate defendant] was incorporated by Leavens, Edmund Gannon and George Greene for the purpose of manufacturing and marketing automatic typing devices. Leavens, as President and a director, became the financial man and chief executive officer of Datatape. Greene was Vice President and a director and technical man and an inventor of the Letteriter. Gannon, also a Vice President and director, was in charge of sales and marketing. Initially Leavens, Gannon and Greene shared equally in the common stock of Datatape, but in July 1963 Leavens acquired 60% of its common stock and 100% of its newly issued preferred stock. * * *
 
 
 4
 "Prior to January 1960 in California, Greene, under the name of Greene Engineering Company, had commenced work on an automatic typing device using the standard bar type I.B.M. typewriter; * * *. Upon the appearance on the market in August 1961 of the I.B.M. Selectric typewriter, Greene presented to Leavens and Gannon his initial ideas respecting the Letteriter, and in January 1962 Greene demonstrated a rough prototype thereof to his associates. In March of that year, after viewing another prototype, Leavens and Gannon determined that the Letteriter was ripe for production and sale, and authorized Greene to proceed with its manufacture.
 
 
 5
 "Three distributorships[3] were established for marketing Letteriters to be manufactured by Greene Engineering and sold by Datatape. * *
 
 
 6
 * * * * * *
 
 
 7
 "The Letteriter was first produced for sale by Greene Engineering in September, 1962. By November, 1962, after approximately six machines had been delivered by Greene, Leavens and Gannon decided that Greene would have to be removed as the manufacturer of the Letteriter. The machines produced for sale by Greene were poorly constructed and in an early stage of development. They were received by the distributors in inoperable condition, and, despite servicing by the distributors, frequently required further service during use by customers.
 
 
 8
 "Greene had manufactured approximately 90 Letteriters in the period from about September 1962 to July 1963. * * *
 
 
 9
 * * * * * *
 
 
 10
 "There was no material improvement in the operation of the later machines manufactured by Greene. As time went on, the machines in the customers' premises developed new and more serious difficulties, and eventually all the Greene machines required complete rehabilitation.
 
 
 11
 "Leavens showed Walker, President of Pix [Manufacturing Company — "Pix"],[4] a Letteriter machine manufactured by Greene and told him that Datatape had been experiencing great difficulty in servicing the Greene machines and was seeking a new manufacturer competent to turn out machines which would operate properly. Walker undertook to study a sample of the Greene machines and a brochure descriptive thereof, both of which Leavens left with Walker for that purpose. In late February or early March 1963, Leavens brought Edmund Gannon, the Letteriter distributor for the New York area and a Vice President of Datatape, to Walker's plant to demonstrate the machine. Thereafter Walker told Leavens and Gannon that if Pix took over the manufacture of the Letteriter, it would have the `backing' of the entire Philips organization as a source of technical assistance for the Letteriter project. On April 4, 1963 Walker was given a working model of the Greene Letteriter and a set of related drawings for study. By arrangement with Leavens, Walker visited Greene's plant in California where he inspected Greene's manufacturing facilities and discussed with him the `trouble areas' of the machine."
 
 
 12
 By letters of June 25 and July 3, 1963, Pix offered to produce approximately 100 units at $775. each and Leavens accepted the offer by his letter of July 15, which added:
 
 
 13
 "It is understood that certain pieces will be shipped you from our plant in Richmond, California, and that on this initial run you will credit us for the usable pieces at the price you estimated in your quotation."
 
 
 14
 At a conference between Leavens, Walker and Greene on July 17, it was made clear that Greene was to keep all master drawings and to approve all drawings (including "design changes, if any") of Pix.[5] Greene was to send Pix as soon as possible a Letteriter with all latest approved parts.
 
 
 15
 Pix was unable to obtain sufficient data from the defendants or from Greene to enable it to construct complete Letteriters during July-September 1963. The first Letteriter from Pix was delivered on December 2, 1963.
 
 The trial judge found:
 
 16
 "The parts, tools and drawings were not finally received from Greene until October 1963 and were found to be mostly useless. The later model Letteriter also received from Greene in October failed to function to the satisfaction of Leavens and Pix."
 
 
 17
 Having commenced the practice of preparing handmade samples of Letteriter parts which he thought needed redesigning and sending them to Pix on an "almost daily basis" in September of 1963, Leavens instructed Walker to have nothing more to do with Greene, who had originally been in charge of design, the following month. It was also agreed that Pix would undertake to refurbish the Letteriter machines which had been manufactured by Greene.[6] In assessing the reasons for continuing delays in production, the trial court described Leavens' activities:
 
 
 18
 "Besides continuing to revise the Letteriter Manual of which he was the author, Leavens submitted lists of Letteriter faults, issued instructions for the punch cage set-up, prepared an interposer spring study and a study of the shift and shift valves, and suggested specific solutions and procedures. He frequently brought in to Pix new ideas and developments which required Pix to provide drawings, specifications, samples and prototypes, and thus aggravated the delay of Pix's ability to deliver completed machines to Datatape's distributors."
 
 
 19
 In spite of the fact that only 15 Letteriters had been delivered by April 15, 1964, on that date Leavens authorized Pix to manufacture an additional 500 machines at $648. per unit.
 
 
 20
 While the process of testing[7] and incorporating Leavens' suggested changes in the machine continued:
 
 
 21
 "In November 1964 Leavens borrowed, for experimental purposes, Letteriter # 9702, which he had previously tested and approved at Pix's plant. This experimentation disclosed a variety of difficulties which were itemized in Leavens' letter to Pix dated November 23, 1964, but none of which reflected adversely upon the quality of Pix's manufacture. By October 1964 it had become evident to Leavens and his distributors that it was the basic Letteriter design which was responsible for the persistent and recurring difficulties with the machine in the hands of distributors and customers."
 
 
 22
 With the above in mind, Leavens determined to personally dispose of his interest in the project and he wrote to Pix, on November 24, 1964, offering to sell them the rights to the machine. He expressed his appreciation for Walker's help in "perfecting" the machine and attributed 20 of the 35 improvements in the machine to Pix.[8]
 
 
 23
 In reply to Walker's reminder of the invoices outstanding, Leavens replied in a February 10, 1965, letter that Pix was to blame for the problems as well as for the delay in production, and on March 1, 1965, Leavens
 
 
 24
 "* * * advised Walker by letter that all of the Letteriter problems were due to the poor workmanship of Pix and that the difficulties involved would have been overcome if Leavens' directions had been followed. He therefore requested that all further production by Pix on the Letteriter project be indefinitely postponed."
 
 
 25
 There followed an exchange of accusatory letters and meetings culminating in the filing of this suit on April 8, 1965.
 
 
 26
 After approving the workmanship of Pix, the trial judge found:
 
 
 27
 "The Letteriter which Pix was called upon to manufacture manifested such inherent basic design faults that no matter how well its parts were made, the machine would continue to operate unsatisfactorily."
 
 
 District Court Findings Concerning Guarantees of Leavens
 
 
 28
 After Leavens, on behalf of Datatape, had placed the initial order on July 15. 1963, he wrote on September 10, 1963, to personally guarantee payment. This was at a time, early in the relationship of the parties, when Walker had expressed concern that the parts promised from Greene Engineering had not arrived. After receiving this guarantee, Pix proceeded to establish production facilities for the Letteriter project. See, also, finding quoted near top of page 13 below. Leavens' personal guarantee for the April 15, 1964, 500-unit order was contained in a letter sent to Pix under date of June 5, 1964. The trial court found, in connection with this guarantee:
 
 
 29
 "In reliance upon this guarantee Pix proceeded to order and assemble components and sub-assemblies for the 500 unit order, and had expended in excess of $100,000 for that purpose by the end of 1964."
 
 
 Alleged Warranties Made by Pix
 
 
 30
 Both defendants argue that they were entitled to judgment as a matter of law in light of alleged promises, or representations, made by Pix that Pix would correct the defects and inadequacies of the Letteriter if the defendant Datatape employed Pix to handle the manufacture of the machine.[9]
 
 
 31
 We are of the opinion, however, that if the findings of the trial judge are read as a whole, rather than one sentence out of context as quoted in footnote 9, it is clear that Pix was employed to manufacture the Letteriter and not to control design or similar matters, and that no such representations were made. The trial judge's opinion pointed out the following:
 
 
 32
 (a) The trial court summarized the testimony of George Greene, a Datatape stockholder and inventor of the Letteriter, which was taken by deposition in California. It was disclosed that:
 
 
 33
 "Leavens was aware, according to Greene, in July of 1963, that further research and development work on the Letteriter was essential, but [Greene] was directed by Leavens to concentrate on the research and development while Pix performed only the manufacturing and assembly of the machine."
 
 
 34
 (b) In discussing the emergence of the working relationship between Leavens and Pix which developed shortly after the initial contract for 100 Letteriters was negotiated, the court found:
 
 
 35
 "In September of 1963, Leavens commenced the practice of preparing handmade samples or sketches of Letteriter parts and sub-assemblies and discussed his new ideas for improving the Letteriter on an almost daily basis with Walker and other Pix personnel. Pix did its best to cooperate with Leavens in developing his new ideas, although, as the number of changes he directed on the Letteriter increased, production became more and more difficult and time-consuming on Pix's part.
 
 
 36
 "Leavens instructed Walker to have nothing further to do with Greene after October 1963. * * * After discharging Greene as a director of Datatape and thereby preventing his furnishing engineering consulting services on the Letteriter, Leavens assumed personal direction and control of the engineering, as well as the manufacture thereof and advised Pix that no changes were to be made thereafter without Leavens' authorization."
 
 
 37
 (c) Not only did Leavens submit ideas for developing and improving the Letteriter, but also he arranged for the corporate defendant to reimburse Pix at the rate of $200. per week for Pix's employment of a designer draftsman "to work almost exclusively on the Letteriter project correcting, updating and clarifying Greene's drawings, and later preparing drawings of the changes conceived of and authorized" by him.[10]
 
 
 38
 (d) Several months after the parties negotiated the contract which provided for Pix's construction of an additional 500 Letteriters, Leavens continued to provide Pix with design changes. The court found that in August and September of 1964 Pix, under Leavens' direct supervision, redesigned and made prototypes for at least 12 parts of the machine. Leavens readily agreed that these changes were needed and "could not have been in the contemplation of the parties when the Pix price quotation was submitted."
 
 
 39
 The record, as well as the foregoing findings, make clear that Leavens switched manufacturing firms in an effort to ensure quality production with full knowledge that design defects existed in his product, which defects he originally anticipated would be corrected by Greene, and later through his own efforts. His reimbursement of Pix for expenditures made for the incorporation of the myriad design changes he suggested is proof that the parties did not anticipate that Pix would be engaged in research and development when the contract was initially negotiated. A well recognized principle of contract law requires that the terms of a contract be interpreted in light of the meaning which the parties themselves have attached to them as evidenced by their subsequent conduct. Thus, the Restatement of Contracts, § 235, provides, in part:
 
 
 40
 "(e) If the conduct of the parties subsequent to a manifestation of intention indicates that all the parties placed a particular interpretation upon it, that meaning is adopted if a reasonable person could attach it to the manifestation."
 
 
 41
 See Balsham v. Koffler, 8 N.J.Super. 48, 73 A.2d 272, 274 (1950).
 
 
 42
 As to appellants' claims of breach of warranty, the trial judge made these findings and conclusions:
 
 
 43
 "I find in the evidence no basis for concluding that Walker made any expressed warranty that the Letteriters which Pix manufactured would adequately serve the purpose of Leavens or the distributors of Datatape. Moreover, there is no foundation in the proofs supportive of an implied warranty that the Letteriter machines would perform their intended functions for any substantial period of time without service. I therefore conclude that the plaintiff has not committed any breach of express or implied warranty either in the rate or sufficiency of its production of the machines."
 
 
 44
 The finding that there were no express warranties which were violated is not clearly erroneous. Also, the District Court's findings that the quality of Pix's workmanship was good is justified and the unusual nature of the work to be done by Pix[11] supports the conclusion that no implied warranties were breached.
 
 
 45
 For these reasons, appellants' reliance on alleged warranties as both a defense to Pix's suit and as a basis for damages in the counterclaim must be dismissed.[12]
 
 
 Alleged Lack of Consideration for the Personal Guarantees
 
 
 46
 Defendant Leavens, the driving force behind Datatape's attempt to turn the Letteriter concept into a marketable commodity, argues on this appeal that no judgment should have been entered against him individually since his personal guarantees of Datatape's obligations were unenforceable for lack of consideration.
 
 
 47
 The trial court found that about July 15, 1963, defendant Datatape placed a purchase order, accepted by plaintiff, for 100 Letteriter machines and that an additional 500 machines were ordered, and the order accepted, around April 15, 1964. Since the writings which Leavens signed evincing his personal guarantee were not sent until September 10, 1963, and June 5, 1964, respectively, he argues that they were given without consideration because Pix was already under a legally enforceable duty to manufacture the Letteriters. Once again, a review of the trial judge's findings as a whole reveals such a claim to be the result of an overly simplistic reading of such findings.
 
 
 48
 The record indicates that part of the original understanding of the parties in July of 1963, when the agreement for the first 100 machines was negotiated, was that Datatape's former manufacturer, Greene Engineering, would supply Pix with "final drawings" of parts, back inventory of parts in its possession, and a working Letteriter. By September 6, 1963, this material had not been received and Pix
 
 
 49
 "* * * wrote Leavens that the quotations which had been submitted in the letters of June 25 and July 3 did not anticipate major delays but were based upon
 
 
 50
 `manufacturing the Letteriter to a frozen design, except for a few limited changes which were to be made, and the availability of all the required drawings, all the detailed assemblies, all of the residue of purchased parts from the first machines, and an up-to-date machine, properly adjusted, which would be used as a working sample.'"
 
 
 51
 It was in response to this letter that Leavens wrote on September 10, 1963, to personally guarantee payment of the order for the first 100 machines. The trial court then found:
 
 
 52
 "In reliance upon this undertaking, and upon information which Walker had obtained respecting the financial standing of Leavens, Pix proceeded to establish a manufacturing and assembly facility for the Letteriter * *."
 
 
 53
 Viewed in the light of these facts, it is clear that Pix commenced assembly of a manufacturing facility for the Letteriter before it was legally obligated to do so since it could have delayed such expenditures until it was satisfied that Greene Engineering had supplied the agreed upon information and materials. Such an undertaking was sufficient to furnish legal consideration for Leavens' personal guarantee.[13] Furthermore, it appears that the preliminary negotiations of the parties anticipated that the relationship between Pix and Datatape was to be an ongoing one, encompassing more than the manufacture of the first 100 machines.[14] This concept of a continuing relationship, necessarily to be modified from time to time as experience in the manufacturing occurred, is amply supported by the subsequent conduct of the parties which eventually resulted in a contract for an additional 500 Letteriters.
 
 
 54
 With reference to Leavens' guarantee for the second, larger order, it is not necessary to pass on Pix's contention on this appeal that the change in the billing procedures[15] which it made at Leavens' request, was legal consideration for his personal guarantee for the 500-unit order. The Restatement of Contracts, § 84, provides in part:
 
 
 55
 "Application of Rules to a Number of Special Cases.
 
 
 56
 "Consideration is not insufficient because of the fact
 
 
 57
 * * * * * *
 
 
 58
 (d) that the party giving the consideration is then bound by a contractual or quasi-contractual duty to a third person to perform the act or forbearance given or promised as consideration * * *."
 
 
 59
 The illustration of the operation of this rule offered under the heading "Illustration of Clause (d)" reads:
 
 
 60
 "A owes B $10. C promises that he will give A a book in return for A's payment of the debt or in return for A's promise to pay it. The payment or promise of payment is sufficient consideration."
 
 
 61
 Assuming the facts to be as Leavens argues them to be, namely that Leavens guaranteed the 500-unit order in exchange for a promise by Pix to do something which it was already legally obligated to do, i. e., construct the machines, Pix owed such a duty to the Datatape corporation and not to Leavens individually. Hence, the performance which Leavens bargained for, although already owed to a third party was legally sufficient consideration as to him.[16] This section of the Restatement has been adopted and cited with approval by the courts of New Jersey, whose law controls this case. See Ross v. Realty Abstract Co., 50 N.J.Super. 147, 141 A.2d 319, 322 (1958), where the court said:
 
 
 62
 "In any case, even if plaintiffs were regarded as under an enforceable obligation to M & J Homes Company to complete all the work regardless of payment, their promise to a third person to do so was sufficient to support a reciprocal undertaking by the third party."[17]
 
 
 63
 Since, as we have indicated, Leavens' financial interest in Datatape was substantial, performance of Pix's obligation to Datatape was clearly an event which would have benefited Leavens.
 
 
 64
 For the reasons stated, the judgments against both defendants will be affirmed.
 
 
 
 Notes:
 
 
 [1]
 The Letteriter is an attachment to the I. B. M.'s "Selectric" model electric typewriter that converts the Selectric to an automatic typing apparatus. With the Letteriter attachment, typing simultaneously produces a perforated paper tape. The tape can then be fed into the Letteriter's "reading" unit, which automatically reproduces the material as if it were original typing, and can simultaneously reproduce the tape as well
 
 
 [2]
 The amount of the judgments was $113,859.93 and costs
 
 
 [3]
 These distributorships were in New York City, Washington, D. C., and Houston, Texas
 
 
 [4]
 A division of the plaintiff corporation
 
 
 [5]
 On parts that had been firmed, Greene was to send Walker "(a) final drawings and jigs or fixtures for these parts; (b) surplus parts on hand not needed by Mr. Greene; (c) a written record showing part no., description, quantity on hand and costs with a copy to Mr. Leavens for bookkeeping."
 
 
 [6]
 Because of the complex nature of the Letteriter, Pix was forced to hire the head serviceman for Datatape's New York distributor to test run and approve the machines as they came off the production line and an I. B. M. Selectric serviceman to check the typewriters
 
 
 [7]
 Leavens decided to personally test and approve each Letteriter during the summer of 1964
 
 
 [8]
 At a meeting in late December 1964, Pix declined Leavens' offer to sell and reminded him of Pix's current inventory of more than $100,000. in connection with the project. The parties agreed at this meeting that no more Selectric typewriters would be sent to Pix, that Pix would stop purchasing materials for the project, and that Pix would avoid suggesting to third parties that the Letteriter was in any kind of trouble so as to better enable Leavens to sell his share
 
 
 [9]
 Primarily, the defendants contend that the District Court's legal conclusions are inconsistent with its factual findings. They rely,inter alia, on the following sentence from the trial court's opinion: "In connection with this offer, Walker promised that the defects and inadequacies in the Letteriter machine which had been disclosed during its production by Greene would be corrected and obviated if Pix were employed to handle the development and improvement of the Letteriter."
 
 
 [10]
 The trial judge also found:
 "Also reimbursed by the defendants were other unanticipated expenditures which Pix was forced to incur commencing in the Fall of 1963 in connection with its manufacture of the Letteriter. From time to time thereafter the defendants agreed with Pix to the addition of approximately 30 different items of cost on each Letteriter machine which involved corrections or improvements not contemplated by the parties in July 1963. These additional costs amounted to the sum of $115.70 per machine which was added to the invoice price of $775 for each unit completed and billed to defendants.
 "Discussions between Leavens and Walker resulted in the latter's oral agreement in September 1963 to refurbish and rehabilitate the Letteriter machines which had been manufactured by Greene in California, and pursuant thereto most of these Greene machines were sent to Pix for that purpose. The refurbishing of these machines consisted essentially of replacing a substantial number of the Greene parts with Pix parts and assemblies, and adjusting the machines in accordance with Pix's procedures. This involved a cost charged by Pix to and paid for by Datatape ranging from $300 to $400 per machine, and this work resulted in considerable delay in the production by Pix of new Letteriters."
 
 
 [11]
 As noted below (pages 46-47), there was basically one manufacturing contract involved which was amended from time to time to include repair of the Greene-produced machines and the substitution of parts designed by Leavens in the new Pix-made machines. See footnote 10 and letter of June 25, 1963 quoted below in footnote 14. Under these circumstances, there is considerable doubt that Article 2 of the Uniform Commercial Code applies to all of the work done by Pix for which recovery was allowed (for example, the repair of the Greene-produced machines, the charge for the designer-draftsman services, the parts and sub-assemblies purchased by Pix, the cost of labor spent on the Letteriter, etc.)
 
 
 [12]
 Rule 52(a), F.R.Civ.P., in discussing the manner in which the findings of a trial court sitting without a jury should be reviewed, provides: "* * * Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." The trial judge found that Leavens' testimony was inconsistent and insincere, using this language:
 "Leavens' testimony in support of Datatape's counterclaim in this case is inconsistent with his documented statements and insincere in the light of his conduct."
 
 
 [13]
 1 Williston, Contracts (3d ed. 1957), § 131b, provides:
 "If the act, the performance of which, or the promise of which, is the consideration for the new agreement, differs in any respect from the act which the double contractor was under a previous obligation to perform, the second agreement is binding * * *."
 
 
 [14]
 In his letter of June 25, 1963, to Leavens, Walker advised:
 "In contemplating the manufacturing of these entire units here at Pix, we concur with the thoughts of first producing some quantity of 50 to 100 Letteriters, then starting through a larger quantity, in the order of 500 or more, even possibly 1,000, during which time ample opportunities will be presented at the manufacturing level to induce economies. * * *"
 
 
 [15]
 Plaintiff contends that the request by Leavens, on the same day that his second guarantee was executed, that the billing for completed Letteriters be delayed "until the physical shipment is made," was accepted in return for such guarantee
 
 
 [16]
 Leavens' stock ownership of Datatape made it fully understandable for him to bargain for a promise that performance would be rendered to Datatape
 
 
 [17]
 In Joseph Lande & Son v. Wellsco Realty, 131 N.J.L. 191, 34 A.2d 418, 422-423 (E. & A.1943), the court said:
 "* * * plaintiff was under no obligation to the owner, to fulfill its subcontract; and, while it is the generally accepted doctrine that the performance of * * * a preexisting obligation under a contract with the promisee is not a sufficient consideration, there is a contrariety of view as to whether the principle is applicable where the duty arises under a contract with a third person. * * * In England, it is now the established rule that the performance of a contractual duty previously undertaken with a third person is sufficient consideration if it is beneficial to the defendant. * * * While this seems to be the minority view in this country, it is an accordance with the modern trend. A.L.I. Contracts, sec. 84(d); Williston on Contracts, Rev. Ed., secs. 131, et seq. The principle was applied by this court in * * * [citing case]."