478 F.2d 556
 CAPITOL BUS COMPANY, t/a Trailways of Pennsylvania
v.
BLUE BIRD COACH LINES, INC., et al.
Appeal of BLUE BIRD COACH LINES, INC. and Aetna Casualty and
Surety Company, 71-2005.
Appeal of AMERICAN FIDELITY FIRE INSURANCE COMPANY, 71-2006.
 Nos. 71-2005, 71-2006.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 1, 1972.
Decided May 14, 1973.
 
 James K. Thomas, Joseph P. Hafer, Metzger, Hafer, Keefer, Thomas & Wood, Harrisburg, Pa., for appellants in No. 71-2005 and cross-appellees in No. 71-2006.
 Frederick W. Andrews, Pannebaker, Andrews & Yost, Harrisburg, Pa., for cross-appellant in No. 71-2006 and as appellee in No. 71-2005.
 Clyde W. McIntyre, McNees, Wallace & Nurick, Harrisburg, Pa., for appellee in both cases.
 OPINION OF THE COURT
 Before KALODNER, ADAMS and HUNTER, Circuit Judges.
 KALODNER, Circuit Judge.
 
 
 1
 In this diversity action, tried to the District Court upon stipulated facts, the appellant insurance companies were held liable to the appellee Capitol Bus Company, t/a Trailways of Pennsylvania ("Trailways"), for $13,700 damages to one of its buses on November 8, 1969, while it was being operated in the franchise area of the appellant Blue Bird Coach Lines. ("Blue Bird"), under an "Equipment Lease Agreement" ("Agreement"), designed to provide for the continuous carriage of passengers, without change of buses, over the franchise areas of the five bus lines party to the Agreement. The appellant American Fidelity Fire Insurance Company ("American") was the property damage insurance carrier for Trailways and the appellant Aetna Casualty and Surety Company ("Aetna") was Blue Bird's property damage insurance carrier.
 
 
 2
 The bus lines party to the Agreement participated in operating a scheduled run from Washington, D.C. to Erie, Pennsylvania through their franchise areas.
 
 
 3
 Trailways' franchise area extends from Washington, D.C. to Elmira, New York. Blue Bird's franchise area extends from Corning, New York to Jamestown, New York.
 
 
 4
 Two drivers, working in eight-hour shifts, were employed in the run; one from Washington, D.C. to Olean, New York, and the other from Olean to Erie, Pennsylvania, and return to Olean.
 
 
 5
 Trailways furnished the driver on the Washington to Olean shift. Blue Bird furnished the driver on the Olean to Erie, and return to Olean, shift.
 
 
 6
 Trailways paid its driver his mileage pay rate on his Washinton to Olean shift. It also paid incidental Social Security taxes, federal and Pennsylvania unemployment and Workmen's Compensation. Blue Bird reimbursed Trailways for use of Trailways' driver on a nonprofit basis at the rate of 13 cents per mile from the driver's entry into Blue Bird franchise area at Corning until the end of his shift at Olean.
 
 
 7
 Blue Bird received all the revenue benefits from the operation of the bus by the Trailways driver between Corning and Olean. It paid Trailways 18 cents per mile for use of the bus after it entered its franchise area at Corning, in consonance with Paragraph 11 of the Agreement which provided that "[e]ach operating carrier agrees to pay the owning carrier of buses leased hereunder a rental of eighteen cents (18cents) for each mile that such leased buses are operated by such operating carrier." (emphasis supplied.)
 
 
 8
 The bus was damaged when it ran off the road while being driven by the Trailways driver at Andover, New York. Andover lies between Corning and Olean, Blue Bird franchise area.
 
 
 9
 The question here presented is whether American, Trailways' property damage insurance carrier, or Aetna, Blue Bird's property damage insurance carrier, is liable for payment of the damages sustained by the bus. American contends it is not liable since in its view Blue Bird was the "operating carrier" of the bus when it was damaged, and American's policy provides that its coverage "shall cease while owned buses are being operated by other bus companies under . . . interchange agreements." Aetna contends "Blue Bird, Aetna's insured, was not an operating carrier within the meaning of the Equipment Lease Agreement," and that the coverage of its policy specifically extends "only with respect to the terms and conditions of the equipment lease agreement." Aetna further contends that "[t]he principles of agency and respondeat superior also indicate that the Trailways operator remained in the employ of its [sic] original master and Blue Bird is not responsible for the damage to the bus."
 
 
 10
 As earlier stated, the District Court ruled that both American and Aetna were liable under their policies for payment of the damage to the bus. It based its ruling on its holding that the Trailways driver was the "servant" of both Trailways and Blue Bird when the bus was damaged and thus the two bus lines were "operating carriers" under the Agreement which made an "operating carrier" liable for damage to a bus.
 
 
 11
 The District Court resorted to general agency principles in ruling that the Trailways driver was the "servant" of the two bus lines, citing Dickerson v. American Sugar Refining Co., 211 F.2d 200 (3 Cir. 1954); Restatement (Second) Agency Secs. 226, 227 (1957); Annot., 17 A.L.R.2d 1388 (1951).
 
 
 12
 The District Court erred when it resorted to general agency principles and it compounded its error when it premised its holding that both bus lines were "operating carriers" on its common servant finding.
 
 
 13
 We are here concerned solely with rights and liabilities of parties spelled out and fixed by the terms of a contract to which they are party.
 
 
 14
 Where a contract relating to leasing of equipment spells out and fixes the liabilities of the lessor and lessee with respect to damages sustained by the leased equipment the contract alone must be looked to, and general agency principles are inapplicable. The fact that general agency principles would be applicable in determining the liability of the lessor and lessee with respect to damages suffered by a third party in the use of the equipment is irrelevant to the determination of the rights and liabilities of the contracting parties inter se.[1]
 
 
 15
 What has been said brings us to the Agreement which was executed May 15, 1969, some six months prior to the happening of the bus accident.
 
 The Agreement provides in relevant part:
 
 16
 "1. PURPOSE
 
 
 17
 "The purpose of this agreement is to provide for the interchange of motor vehicle equipment between the parties hereto for operation in through service without change of buses, over the authorized operating routes of the respective parties. . . .
 
 
 18
 "2. DEFINITIONS
 
 
 19
 "(a) 'Owning Carrier' as used herein means the status assumed by any party hereto when it permits any bus owned by it to be used and operated by any of the other parties hereto under and by virtue of this agreement.
 
 
 20
 "(b) 'Operating Carrier' as used herein means the status assumed by any party hereto when such party takes, uses and operates the bus of another party hereto under and by virtue of this agreement.
 
 
 21
 "(c) Operation of lease equipment shall be deemed to have begun when delivery of a bus leased hereunder is accepted by the driver, operator or other authorized representative of any operating carrier, and shall be deemed to continue until delivery of said leased bus is accepted by the driver, operator or other authorized representative of another party hereto.
 
 
 
 * * *
 "4. EQUIPMENT AND USE
 "Each of said parties hereto shall furnish for use and operation by all of the parties hereto the number of buses of late model and of uniform make and design shown opposite its name in Schedule A attached. . . . Each of the said parties agrees to take, use and operate said equipment on its respective portion of said through routings in order to maintain the through schedule described in Schedule B attached. All expense for operating said buses shall be borne by the owning carrier, except for the compensation of operators or drivers; public liability insurance; highway, mileage, use and franchise taxes and highway, bridge, ferry, tunnel and terminal tolls and charges, which shall be borne by the operating carriers. . . .
 "5. DRIVERS
 "Each operating carrier shall furnish competent operators or drivers to operate buses leased by it hereunder.
 
 
 
 22
 * * *
 
 
 23
 "7. DAMAGES TO LEASED BUSES
 
 
 24
 "Whenever any leased bus is damaged by accident or collision, except loss or damage occasioned by fire, all costs of repairs shall be borne by the operating party in whose possession said bus was held or by whom such bus was being operated at the time of such damage. . . .
 
 
 
 * * *
 "9. PUBLIC LIABILITY INSURANCE
 "Each operating carrier shall be solely and fully responsible for the operation by it of leased buses and to that end agrees to indemnify and save harmless each of the other parties hereto from and against any and all claims, suits, or judgments for personal injuries, including death, and damage to or loss or destruction of property resulting from operation by such operating carrier. . . .
 
 
 
 25
 * * *
 
 
 26
 "11. RENTAL
 
 
 27
 "Each operating carrier agrees to pay to the owning carrier of buses leased hereunder a rental of eighteen cents (18cents) for each mile that such leased buses are operated by such operating carrier. . . .
 
 
 28
 "12. RETENTION OF INDIVIDUAL RESPONSIBILITY AND RIGHTS
 
 
 29
 "Each operating carrier retains full responsibility and authority for the conduct of its common carrier service over its respective portion of the through routings. No party shall have any liability or expense due to the action of or operation by any other party except as specifically provided herein and in no way shall any party hereto be considered to have surrendered or transferred any of its rights to any other party." (emphasis supplied).
 
 
 30
 In construing the Agreement we must give effect to these well-settled principles:
 
 
 31
 A contract is to be considered as a whole, and, if possible, all its provisions should be given effect; while a contract's provisions must be interpreted with reference to the whole the specific controls the general; and a contract should be construed so as to give effect to its general purpose.[2]
 
 
 32
 A contract must be interpreted in light of the meaning which the parties have accorded to it as evidenced by their conduct in its performance.[3]
 
 
 33
 Applying the principles stated to the instant case, we are of the opinion that (1) standing alone, and independently so, the Agreement, by its terms, constituted Blue Bird the "operating carrier" of the bus when it was damaged while being operated in Blue Bird's franchise area; and (2) Blue Bird's course of conduct in the performance of the Agreement demonstrated that it interpreted the Agreement as constituting it the "operating carrier" of the bus when it was damaged. On the score of the latter holding we need only point out that it is undisputed[4] that Blue Bird paid Trailways 18 cents per mile rental for the bus from its entry into Blue Bird's franchise area in consonance with Paragraph 11 of the Agreement which provided "[e]ach operating carrier agrees to pay to the owning carrier of buses leased hereunder a rental of eighteen cents (18cents) for each mile that such leased buses are operated by such operating carrier," and that Blue Bird also paid Trailways 13 cents per mile for the driver's wages while the bus was being operated in Blue Bird's franchise area in consonance with Paragraph 4 of the Agreement which requires the "operating carrier" to pay "the compensation of operators or drivers."
 
 
 34
 Our view that the Agreement, standing alone, must be construed as constituting Blue Bird the "operating carrier" of the bus when it was damaged while being operated in Blue Bird's franchise area is premised on these considerations:
 
 
 35
 The Agreement, considered as a whole, was designed, as earlier stated, to provide for the continuous carriage of passengers, without change of bus, over the franchise areas of the five signatory parties.[5]
 
 
 36
 In implementation of its design, the Agreement defines an "operating carrier" as one which "takes, uses and operates the bus of another party"[6] in its franchise area, and spells out the scope of authority and liabilities of the "operating carrier" with respect to use of the leased bus and the terms and conditions of the rental.
 
 
 37
 Critical to the issue whether Blue Bird was an "operating carrier" when the bus was damaged in its franchise area is the provision of the Agreement that "[e]ach of the said parties agrees to take, use and operate said equipment on its respective portion of said through routings in order to maintain the through schedule. . . ."[7] (emphasis supplied).
 
 
 38
 The force of this provision is that the bus was delivered to, and accepted by, Blue Bird when it entered its franchise area.[8]
 
 
 39
 Further critical to the issue of Blue Bird's liability for payment of the damages to the bus in its franchise area are the provisions that (1) "[w]henever any leased bus is damaged by accident or collision . . . all cost of repairs shall be borne by the operating party in whose possession said bus was held or by whom such bus was being operated at the time of such damage. . . .";[9] (2) "[e]ach operating carrier shall be solely and fully responsible for the operation by it of leased buses. . . .";[10] (3) "[e]ach operating carrier retains full responsibility and authority for the conduct of its common carrier service over its respective portion of the through routings."[11] (emphasis supplied).
 
 
 40
 It may be noted that the District Court held that the Agreement, by its terms, constituted Blue Bird an "operating carrier" at the time the bus was damaged.
 
 
 41
 There is no basis in the Agreement for the District Court's finding that Trailways was also an "operating carrier," inasmuch as the bus was not operating in Trailways' franchise area when it was damaged. It made that finding on its theory that the bus driver at the time of the accident was the "common servant" of both Trailways and Blue Bird under general agency principles, which as we earlier stated, was erroneous.
 
 
 42
 In accordance with what has been said the Order of the District Court will be vacated and the cause remanded with directions to proceed in accordance with this Opinion.
 
 
 
 [1]
 Cf., McGill v. Bison Fast Freight, Inc., 245 N.C. 469, 96 S.E.2d 438, 442 (1957)
 
 
 [2]
 J. E. Faltin Motor Transportation, Inc. v. Eazor Express, Inc., 273 F.2d 444, 445 (3 Cir. 1959); Empire Properties Corporation v. Manufacturers Trust Co., 288 N.Y. 242, 43 N.E.2d 25 (1942); Pritchard v. Wick, 406 Pa. 598, 178 A.2d 725 (1962); Restatement, Contracts Secs. 235 (c), 236(b) and (c) (1932); Williston on Contracts, Third Edition Secs. 618, 619 (1961)
 
 
 [3]
 Philips Electronics & Pharmaceutical Industries Corp. v. Leavens, 421 F.2d 39, 45 (3 Cir. 1970); American Cyanamid Company v. Ellis-Foster Company, 298 F.2d 244, 246 (3 Cir. 1962); Pittsburgh Railways Company v. Equitable Life Assurance Society of the United States, 288 F.2d 640, 642 (3 Cir. 1961); Maloney v. Glosser, 427 Pa. 548, 552, 235 A.2d 607, 609 (1967); Heilwood Fuel Co., Inc. v. Manor Real Estate Company, 405 Pa. 319, 328, 175 A.2d 880, 884 (1961); Restatement, Contracts Sec. 235(e) (1932)
 "An important aid in the interpretation of contracts is the practical construction placed on the agreement by the parties themselves." Williston on Contracts, supra note 2, Sec. 623, at 789.
 
 
 [4]
 Paragraph 12 of the "Recommendations of Findings of Facts," submitted to the District Court and signed by counsel for Blue Bird, Aetna and American, states:
 "At the time of this accident, Blue Bird paid Trailways at the rate of $.18 a mile for the bus under paragraph 11 of the Agreement attached hereto and $.13 a mile for the driver's wages under a supplemental understanding while the bus was being operated under Blue Bird franchise. The wages of the driver were paid by Trailways."
 
 
 [5]
 Agreement, Paragraph 1
 
 
 [6]
 Id., Paragraph 2(b)
 
 
 [7]
 Id., Paragraph 4
 
 
 [8]
 This cited provision is dispositive of Blue Bird's contention that "Blue Bird had not accepted delivery of the bus" within Paragraph 2(c) of the Agreement which provides that "[o]peration of lease equipment shall be deemed to have begun when delivery of a bus leased hereunder is accepted by the driver, operator or other authorized representative of any operating carrier. . . ." To hold otherwise would be in disregard of the settled rule that provisions of a contract must be construed in light of the totality of the contract's provisions and stated purpose. Further, the fact that Blue Bird collected revenues derived from operation of the bus from the point it entered its franchise area and paid mileage rental to Trailways from that point and recompensed Trailways for the driver's use establishes that Blue Bird considered it had accepted delivery of the bus
 
 
 [9]
 Id., Paragraph 7
 
 
 [10]
 Id., Paragraph 9
 
 
 [11]
 Id., Paragraph 12