**AMERICAN MUTUAL LIABILITY IN-SURANCE COMPANY, a corporation, Plaintiff,**

v.

**BOLLINGER CORPORATION, a corporation, Defendant.**
**Civ. A. No. 74–345.**

United States District Court,
W. D. Pennsylvania.
Oct. 23, 1975.

John W. Jordan, IV, Pittsburgh, Pa., for plaintiff.

Thomas R. Johnson, Pittsburgh, Pa., for defendant.

## OPINION AND ORDER

MARSH, District Judge.

In this diversity action, the plaintiff, American Mutual Liability Insurance Company (American), sues the defendant, Bollinger Corporation (Bollinger), for unpaid premiums on two issued insurance policies covering certain risks of Bollinger and its four closely connected corporations. The amount prayed for in the complaint is $20,562.60 which was amended to $20,486.60. Plaintiff also amended to claim premiums allegedly due on two policies of insurance instead of three.

The four other corporations covered by the policies were Vulcan Tank Company (Vulcan) and Portersville Equipment Company (Portersville), both wholly owned subsidiaries of Bollinger at the time coverage became effective; Kincaid Industries (Kincaid), which owned 86% of Bollinger's stock, and Superior Wall Products Company (Superior), a wholly owned subsidiary of Kincaid.

Morton J. Greene was President and Chairman of the Board of Kincaid and owned 58% of its stock (PX12); he also was Vice President and Chairman of the Board of Bollinger, Vice President of Superior Wall, Portersville and Vulcan. Thomas R. Allen was President of Bollinger, Portersville and Vulcan and Vice President of Kincaid. Eugene Lysick was Treasurer of Bollinger, Portersville and Vulcan.

Prior to July, 1971, the aforesaid corporations had various liability insurance policies with several insurance companies. After a review it was decided by Bollinger to place Workmen's Compensation and multi-peril liability insurance with a multiple coverage carrier, such as plaintiff (PX28), with increased premium discounts and increased dividend al-

lowances, thereby saving in excess of $2,000 a year. (Tr. pp. 55–56, 257). It was not only advantageous economically but also administratively for Bollinger and its two wholly owned subsidiaries to consolidate their Workmen's Compensation policies, multi-peril policies and automobile liability policies with one common expiration date, (Tr. p. 419). In addition, plaintiff was the lowest bidder, (Tr. pp. 298–299).

All policies with plaintiff had expired or were cancelled on July 2, 1973. Bollinger obtained coverage elsewhere. (PX4, Tr. pp. 289–290, 495).

The defendant, Bollinger, denies that it is liable to plaintiff for any unpaid premiums. The defendant also invokes the Pennsylvania Statute of Frauds, 33 P.S. § 3 as a defense; and contends that any prior agreement on its part to pay the premiums of Kincaid and Superior would be a breach of a fiduciary duty, resulting in corporate waste or an illegal constructive dividend because 14% of its stock was publicly owned.

Bollinger claims $31,402.40 [1] for "excess premiums" allegedly paid to plaintiff. As we understand Bollinger's contention, the obligation of each corporation named in the policies was several, and Bollinger contends that following the sale of Vulcan to Thomas L. Helton in late 1973, plaintiff agreed to credit Bollinger with all the premiums it had paid on behalf of Vulcan and to look solely to Vulcan for payment of the amount thereof. (PX3, PX4, PX5, PX7). Since Vulcan did not pay, Bollinger seeks by way of the counterclaim to recover the amount of the Vulcan premiums it had paid to plaintiff in addition to alleged overpayments. (DXH, Tr. pp. 477–479).[2] We find no such agreement; the alleged overpayments were not proved; and plaintiff's denial of the counterclaim will be sustained.

It is our opinion that the plaintiff is entitled to judgment against Bollinger for unpaid premiums in the amount of $15,229.60 and that judgment should be entered in favor of plaintiff and against the defendant on the counterclaim.

We set forth the following additional findings of fact.

1. Plaintiff, American, is a corporate citizen of Massachusetts with its principal place of business in that State. Defendant, Bollinger, is a corporate citizen of Pennsylvania with its principal place of business in Pennsylvania. The matter in controversy exceeds the jurisdictional amount.

2. On July 2, 1971, plaintiff issued and defendant accepted a Workmen's Compensation insurance policy.[3] This policy originally named as insured:

"Bollinger Corporation-Porters (sic) Equipment Company,
Vulcan Tank Corporation,
Address 1001 Duss Ave.
Ambridge, Beaver (County) Pa., 15003.
Corporation"

Later Kincaid Incorporated (sic) and Superior Wall Products Co. were added by endorsement. (PX30, Tr. pp. 52–53).

On July 2, 1972 plaintiff issued and defendant accepted a similar policy [4] providing Workmen's Compensation insurance for five named insureds as follows:

"Declarations Item 1. entitled 'Name of Insured' Bollinger Corporation-Porters (sic) Equipment Company, Vulcan Tank Corporation, Kincaid Incorporated (sic), and Superior Wall Products Co. Address 1001 Duss Ave. Ambridge Beaver (County) Pa. 15003. Corporation"

3. On July 2, 1971, plaintiff issued and defendant accepted a multi-peril

---

1. The counterclaim prayed for $31,381.00.

2. We reject President Allen's testimony that Vulcan owed Bollinger $31,000 for premiums. (Tr. pp. 301–302, 321).

3. WC681818–01–1–C (PX30).

4. WC681818–01–2–C (PX1).

contract of insurance [5] for three named insureds as follows:

"Declarations Item 1. 'Name of Insured' Bollinger Corporation, Portersville Equipment Co. & Vulcan Tank Corporation 1001 Duss Ave., Ambridge, Pennsylvania 15009 (sic)

Item 2. Policy period: From 7/2/71 To 7/2/74 3 years

Item 3. Corporation

Item 4. Location of premises: No. 1 Same No. 2 Rt. 19 Portersville, Butler, Penn. W/S Highway No. 3 3207 Dawson Rd., Tulsa, Oklahoma"

4. Plaintiff mailed all invoices for the premiums due on the policies to Bollinger at its address in Ambridge, Pennsylvania.

5. From the date of issuance of the policies, plaintiff was doing business strictly with Bollinger through its officers, Allen, Lysick and Greene, and relied exclusively on the credit of Bollinger for payment.

6. While the policies were in force Bollinger voluntarily paid all the premiums due thereon. It appears that the date of the last payment was May 14, 1973. (PX29, Tr. p. 345). No payments of premiums were ever received by plaintiff from Vulcan, Kincaid, Portersville or Superior.[6]

7. Although final premium amounts could not be computed until the end of the policy period when an audit was performed by plaintiff, the payments made by Bollinger to plaintiff were in fact payments on account of premiums and not "advance deposits." Were they not premium payments, Bollinger and the connected corporations would not have been insured during the policy period. The Premium Payment Agreements for 1971 and 1972 in the multi-peril policy (PX2 about page 14, and PX46) evidence that payments were indeed premiums and not advance deposits, as does the Premium Payment Notice in the

Workmen's Compensation policies (PX 1, page 2, and PX30, page 4).

■ 8. Taking into account the application for insurance executed by Mr. Allen (PX33), the policies (PX1 and PX2), the Premium Payment Agreements (PX2 about page 14 and PX46), the Premium Payment Notices (PX1 page 2, and PX30 page 4), the method of billing and the method of payment (PX29), we find there was an agreement between Bollinger and plaintiff established by a course of conduct that Bollinger would pay all the premiums due on the policies generated by Bollinger and its connected corporations. These corporations reimbursed Bollinger for the premiums paid on their behalf by way of intra-corporate accounting ("contra accounts"). (Tr. pp. 213, 268–270).

9. This agreement was not altered or modified by letters and invoices including PX3, PX4, PX5, PX6, PX7, PX8, PX13, PX37 or by any other writings introduced into evidence. Plaintiff always looked to Bollinger for payment of premiums up to and including the time the complaint was filed and subsequent trial.

10. All the corporations except Vulcan reimbursed Bollinger via the contra account systems. Premium overpayments received by Bollinger were credited to the respective account of the insured corporations with their respective shares. When Vulcan was sold to Thomas L. Helton in December, 1973, Bollinger was reimbursed by Vulcan. (Tr. pp. 310–311, 331, 382, 395–396, 418).

11. By agreement of sale dated and executed on October 12, 1973 (PX13), Bollinger sold the Vulcan stock to Thomas L. Helton, and Vulcan and Helton agreed, inter alia, to repay Vulcan's indebtedness to Bollinger. The agreement provided that the sale take place on October 31, 1973, but it was postponed several times and was finally consummated

5. MPL681818–03–1 (PX2).

6. Vulcan Tank paid the plaintiff directly in 1971 on a boiler policy. (PX34, page 2).

on December 15, 1973 effective on November 1, 1973. (Tr. pp. 336, 416–417).

12. Because of the sale of Vulcan to Helton, plaintiff at the request of Bollinger prepared separate invoices for unpaid premiums to Bollinger and Vulcan. Plaintiff relied on representations from Bollinger that plaintiff should bill Vulcan directly and separately for any unpaid premiums generated by Vulcan.

13. By letter dated December 15, 1973, addressed to President Allen, Helton agreed to pay premiums for existing insurance on Vulcan, i.' e., from July 2, 1973 to December 31, 1973 which Bollinger was carrying for Vulcan. (PX4). In this letter Helton reaffirmed Vulcan's obligation to Bollinger under the agreement of sale (Finding 11), i. e., to reimburse Bollinger for prior debts due Bollinger from Vulcan. We find this promise to include reimbursement for the insurance premiums theretofore advanced by Bollinger to plaintiff on behalf of Vulcan up to July 2, 1973, the date the policies expired or were cancelled. (Tr. p. 419).

14. The plaintiff did not agree to credit Bollinger with the premiums it had paid on behalf of Vulcan prior to July 2, 1973. The plaintiff did not agree to exonerate Bollinger from liability for the premiums attributable to Vulcan, but was willing to bill Vulcan for the premiums generated by it as suggested by Bollinger and accept payment from Vulcan; but Vulcan did not pay plaintiff. No creditor-debtor relationship existed between plaintiff and Vulcan. Plaintiff never agreed to return to Bollinger the premiums previously voluntarily paid by Bollinger for insurance on the Vulcan risks. Vulcan was never individually responsible to plaintiff for premiums generated on its own insurance coverage.

15. At the time of the sale of Vulcan Tank by Bollinger to Thomas Helton on December 15, 1973, the outstanding balance due Bollinger from Vulcan on the contra account, which included charges for insurance premiums, was completely settled. The total of the Bollinger-Vulcan contra account at the time of closing was approximately $200,000 (Tr. p. 325). In liquidation of this indebtedness Bollinger received $150,000 cash together with a note for $52,000 from Helton at the time of sale. (Tr. p. 418). Since the contra account included premium charges previously advanced by Bollinger, Bollinger's counterclaim against plaintiff for insurance premiums paid by it to plaintiff on behalf of Vulcan must fall. Bollinger was fully reimbursed by Vulcan by settlement of the contra [7] account. (Tr. pp. 310–311, 382, 395–396, 418).

16. Plaintiff's amended complaint for $20,486.60 includes $5,305.00 which is the dividend to which plaintiff claims Bollinger is not entitled. (PX42, PX47).[8] The evidence is convincing that plaintiff itself long after the complaint was filed, and approximately one month before the trial began, voluntarily credited the premiums allegedly due with $5,305.00, the amount of the dividend, leaving a total claim of $15,229.60. This amount coincides with the final balance due as shown on the plaintiff's formal ledger sheets of the Bollinger account (PX27), and on its invoice to Bollinger dated April 23, 1975. (DXF). Apparently plaintiff chose to give Bollinger credit for the $5,305.00 dividend, also shown on the last page of PX27. In the light of the conflicting and con-

---

7. The fact that Vulcan went into a Chapter 10 receivership before the note was paid does not void the contra account settlement between Bollinger and Vulcan.

8. PX47 states that $5,203.00 would be forfeited in the event plaintiff would be unable to collect the unpaid premiums without suit. However, we find that PX27, the plaintiff's ledger sheets showing all debits and credits on this account are more accurate. Page 6 of PX27, shows a crediting dividend of $5,305.00.

fusing state of the record, the plaintiff is bound by the amount shown in PX27 and DXF.

17. From the invoices, statements, audit sheets and dunning letters of plaintiff, it is impossible to calculate an exact amount for premiums due from Bollinger. After considering this confusing evidence we find as a fact that the amount owed by Bollinger to plaintiff is that shown on plaintiff's last invoice (DXF) to Bollinger dated April 23, 1975, showing a net balance of $15,229.60.[9]

18. Bollinger is liable to plaintiff for unpaid premiums in the amount of $15,229.60.

## CONCLUSIONS OF LAW

1. This case does not raise any issue necessitating interpretation of an ambiguity in the policies. Instead, plaintiff seeks payment of earned premiums which defendant not only denies it owes, but contends it has overpaid in excess of $31,000.

■ Where a court is confronted with such an issue it may look to extrinsic circumstances to determine liability. 8 P.L.E., Contracts, 161, 172 (1971). When the meaning of a contract is doubtful the conduct and acts of the parties in furtherance of the contract is strong evidence of their intentions. *Capitol Bus Co. v. Blue Bird Coach Lines, Inc.*, 478 F.2d 556 (3rd Cir. 1973) and the cases cited therein at n. 3; *Eggleston v. Dudley*, 257 F.2d 398, 400 (3rd Cir. 1958). The monthly payments made by Bollinger on account of premiums tend to establish at the very least an implied term of the contract requiring Bollinger to make those payments on behalf of its related corporations.

Thus, we conclude that the plaintiff and defendant by a course of conduct entered into an agreement that the defendant Bollinger would pay the premiums generated by its two wholly owned subsidiaries, Vulcan and Portersville, as well as by Kincaid, the owner of a majority of its stock, and Kincaid's wholly owned subsidiary, Superior.

■ 2. Bollinger invokes the Statute of Frauds provision, 33 P.S. § 3, entitled "Promise to answer for debt of another." It is our opinion this statute is not applicable. There is no evidence that Vulcan was a debtor of plaintiff. On the contrary, Bollinger voluntarily advanced payments to plaintiff for insurance premiums for all its closely related companies named in the policies. Those companies were charged by Bollinger with their respective shares in contra accounts; all reimbursed Bollinger for the premiums it paid for them. Even Vulcan satisfied its contra account with Bollinger upon the consummation of the sale of Vulcan to Helton on December 15, 1973. (Findings 10 and 15). Even if the statute of frauds were applicable, it is obvious that a primary consideration for Bollinger's agreement to pay all the premiums was the fact that such payments continued Bollinger's Workmen's Compensation coverage and that of its sister Pennsylvania corporations. This was clearly a beneficial advantage to Bollinger who was required by law to carry Workmen's Compensation insurance. In addition, considerable savings and other advantages accrued to Bollinger and its connected corporations. (Tr.

---

9. Exhibits introduced by plaintiff completely confuse the issue as to the exact amount of premiums owed by Bollinger. PX7, a letter dated January 25, 1974, has invoices attached showing an amount due from Vulcan of $14,640.84, and an amount due from Bollinger of $616.76, a total of $15,257.60. PX18, an invoice to Bollinger dated February 25, 1974, shows an amount due of $20,562.60, the original amount demanded in the complaint, amended to $20,486.60. The evidence shows this invoice (PX18) was prepared for purposes of litigation and sent to plaintiff's lawyer, but was never sent to Bollinger. PX42, a letter sent to President Allen, dated December 12, 1973, from B. R. Gasparetti, Senior Credit Representative of plaintiff shows a balance of $16,783.60. When added to the dividends which this letter suggests would be forfeited by plaintiff if the aforesaid balance "is not met," the total due is $22,088.60.

pp. 55–56, 257, 419). *Cf. Jefferson-Travis, Inc. v. Giant Eagle Markets, Inc.,* 393 F.2d 426, 430 (3rd Cir. 1968) discussing the application of the "leading object" rule as an exception to the statute of frauds.

 The fact that after Vulcan was sold to Helton in December, 1973, the plaintiff was willing to accept payment of Bollinger's debt, or part of it, from Vulcan, is no indication that a creditor-debtor relationship existed between plaintiff and Vulcan and does not extinguish Bollinger's debt to plaintiff. Restatement, Contracts § 160(3)(4); 12A P.S. § 2–210(1).

 3. We are of the opinion that Bollinger's contention that its payment of the Workmen's Compensation premiums of Kincaid and Superior constitutes either corporate waste or a discriminating dividend is without merit. A corporation can no longer use the defense of ultra vires to withdraw itself from an act it has already performed. *Downing v. Erie City School Dist., et al.,* 360 Pa. 29, 39–41, 61 A.2d 133, 138 (1948); *Strauss v. W. H. Strauss & Co.,* 330 Pa. 517, 199 A. 195 (1938); Business Corporation Law, 15 P.S. § 1303 (1967).

4. Plaintiff contends Bollinger is solely liable for the premiums. *Liberty Mutual Ins. Co. v. Petroleum Venture Capital Corp.,* 216 So.2d 925 (La.Ct. of App., 1968). Bollinger contends each named insured is severally liable citing *In re John B. Rose Co.,* 275 F. 409 (2nd Cir. 1921). Both parties agree that the law is minimal with respect to liability of multiple insureds named in insurance contracts. Since we have found that Bollinger is solely liable (Findings 8 and 18), we need not resolve this apparent dilemma and thus make no ruling on the joint and several aspects of the policies in issue.

 5. Since all the money Bollinger paid plaintiff was paid voluntarily and without fraud, duress or mistake on the part of the plaintiff, Bollinger cannot recover from plaintiff the premiums already paid. *New York Life Ins. Co. v. Levine,* 148 F.2d 313, 314 (3rd Cir. 1945); *Sebastianelli v. Prudential Ins. Co. of America,* 337 Pa. 466, 470, 12 A. 2d 113, 115 (1940); *Ignatovig v. Prudential Ins. Co. of America,* 16 F.Supp. 764 (M.D.Pa.1935).

6. The plaintiff did not agree to exonerate Bollinger from liability for Vulcan's insurance premiums generated from July 2, 1971 to July 2, 1973.

 7. We conclude that interest is not recoverable under the evidence. It has long since been established by the Supreme Court of Pennsylvania that interest is not allowed upon an unliquidated account. *Williams v. Craig,* 1 Dall. (1 U.S.) 313, 315, 1 L.Ed. 153 (1788); *Cf. School Dist. v. Fidelity & Deposit Co.,* 346 Pa. 491, 31 A.2d 279 (1943); *Lackawanna I. & S. Co. v. L. & W. V. R. R.,* 299 Pa. 503, 149 A. 702 (1930).

The evidence discloses that prior to filing the complaint on April 12, 1974, exact computations of the premiums due are not ascertainable (Finding 17). Even the complaint was amended at trial as to the amount demanded, and the counterclaim demand differs from the amount claimed in the pleading (See footnote 1). Also, the uncertainty of whether Bollinger was entitled to a dividend credit and, if so, the amount thereof, prior to the filing of the complaint is in dispute and adds to the unliquidated nature of the amount due to plaintiff. (Finding 16, PX17).

8. Judgment should be entered in favor of plaintiff and against defendant in the amount of $15,229.60.

9. Judgment should be entered in favor of plaintiff and against defendant on the counterclaim.

An appropriate order will be entered.