NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-1026
_____

ROBERT J. ZEBROWSKI;
ROBERT A. WOODRUFF;
GREGORY BIALY

v.

EVONIK DEGUSSA CORPORATION ADMINISTRATIVE COMMITTEE;
EVONIK DEGUSSA CORPORATION RETIREMENT PLAN;
EVONIK ROHMAX USA, INC.  NON-QUALIFIED PENSION PLAN,

Appellants

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-10-cv-00542)
District Judge:  Hon. Edmund V. Ludwig
_____

Argued
October 18, 2013

Before:   RENDELL, JORDAN and GREENAWAY, JR., *Circuit Judges*.

(Filed: August 19, 2014)
_____

Michael T. Graham   [ARGUED]
McDermott, Will & Emery
227 W. Monroe Street – Ste. 5200
Chicago, IL   60606
        *Counsel for Appellants*

Alan M. Sandals   [ARGUED]
Sandals & Associates
One S. Broad Street – Ste. 1850
Philadelphia, PA   19107
        *Counsel for Appellees*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

This is an appeal by the Evonik Degussa Corporation Administrative Committee (the "Committee"), Evonik Degussa Corporation Retirement Plan, and Evonik RohMax USA, Inc. Non-Qualified Pension Plan (together, the "Appellants") of orders of the United States District Court for the Eastern District of Pennsylvania denying the Appellants' motion for summary judgment and, ultimately, granting judgment for Robert Zebrowski, Robert Woodruff, and Gregory Bialy (together, the "Appellees").  According to the Appellants, the District Court erred in holding that an interpretation by the Committee of a benefits plan formulated under the "top hat" provision of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, denied retirement benefits owed to the Appellees.  We agree and will reverse the judgment of the District Court.

## I.    Background[1]

Appellees are former senior executives of Evonik RohMax USA, Inc. ("Evonik") and its predecessors.  All took early retirement.  At issue is the calculation of their retirement benefits.

Evonik sponsors two retirement plans: (1) the Pension Plan, for most employees, and (2) the Supplemental Plan, for upper-level executives.  The Pension Plan is a defined benefit pension benefit plan under ERISA, 29 U.S.C. § 1002(2), that provides a fixed amount of post-retirement benefits for all eligible employees.  It is a "qualified" plan under section 401, *et seq.*, of the Internal Revenue Code (the "Code") because it complies with certain statutory requirements such as compensation limits.  The Supplemental Plan is what is known as a "top hat plan," a defined benefit pension plan that does not require a limit on the amount of compensation that may be recognized.[2]  Top hat plans are "unfunded and … maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees."  29 U.S.C § 1051(2).  They are exempt from ERISA's vesting, funding, and fiduciary requirements.  *Id*. (vesting); *id.* at § 1081(a)(3) (funding); *id.* at § 1101(a)(1)

---

[1] We are faced with a combination of complex benefits schemes and the following recitation of the facts reflects the level of simplification that the parties, mercifully, provided to us in their briefing.

[2] Top hat plans allow executives with salaries above the compensation limit to ensure retirement income that is closer to their pre-retirement income.  They permit an employee to defer some compensation until retirement, when the employee may be in a lower tax bracket.  *See In re IT GRP, Inc*., 448 F.3d 661, 664-65 (3d Cir. 2006) (discussing top hat plans under ERISA).

(fiduciary exception).[3] The Appellees were enrolled in both the Pension Plan and the Supplemental Plan.

At a basic level, benefits under the Supplemental Plan are calculated according to the following formula: $A - B$, where $A$ is the result of a specific formula for calculating benefits owed to an employee without Code contribution limits ("total retirement benefits," according to the Appellants) and $B$ equals "the pension benefit to which a Participant is entitled at his Early Retirement Date" plus any statutory benefits.[4] (J.A. at 221, 229.)

---

[3] Top hat plans are subject to ERISA's reporting and disclosure provisions, as well as its administration and enforcement requirements. 29 U.S.C §§ 1021-1045.

[4] The Supplemental Plan states:

> The Basic Amount of Early Retirement Pension of a Participant who retires from the Company … shall be one-twelfth of $(A-B)$ x $C$:
>
> - $A$ equals 1.5% of the sum of the Participant's Basic Earnings Rate and his Award Program Adjustment, minus 0.35% of the Participant's Final Average Compensation; multiplied by the number of completed years and any fractional parts thereof of Benefit Service up to a maximum of 44 years. This amount shall be calculated without application of Section 415 or Section 401(a)(17) of the Code;
>
> - $B$ equals the … Basic Amount of [Early] Retirement Pension Benefits to which the Participant is entitled from the Pension Plan plus any Statutory Benefits to which the Employee may be entitled; and
>
> - $C$ equals the percentage (not to exceed 1.0) determined by dividing the number of months in the 10 year period preceding the Determination Date that the Participant was an executive career band level or greater by 60.

(J.A. at 229.)

Under both the Pension Plan and the Supplemental Plan, participants may select from two payment options: monthly annuities or a lump sum payment. The Appellees chose to receive their benefits as lump sum payments. Before 2008, participants who chose monthly annuity payments under the plans received an annual cost of living adjustment ("COLA"), but those who selected lump sum payments did not. In 2007, however, the United States Court of Appeals for the Seventh Circuit, in *Williams v. Rohm & Haas Pension Plan*, held that providing COLA adjustments only to participants who selected monthly annuity payments, and not to those who selected lump sum payments, violates ERISA. 497 F.3d 710, 714 (7th Cir. 2007). The court stated that, "[i]f a defined benefit pension plan entitles an annuitant to a COLA, it must also provide the COLA's actuarial equivalent to a participant who chooses instead to receive his pension in the form of a one-time lump sum distribution." *Id.* In response to *Williams*, the Committee amended the Pension Plan in 2008 to include COLAs for lump sum payments. It did not, however, amend the Supplemental Plan to include COLAs for lump sum payments because it believed the reasoning of *Williams* did not apply to the Supplemental Plan.[5]

Here, there is no dispute that factor *C* equals one for all Appellees, as they were all fully vested. The District Court, however, stated that the Committee's interpretation of Factor A as a "total retirement benefit" was "not supported by a plain reading of the plans." (J.A. at 32.) The District Court defined Factor A as "an annuity amount for all regular and bonus compensation without application of Internal Revenue Code Requirements for tax-qualified pension plans." (J.A. at 31-32.)

[5] Under the 1999 Supplemental Plan, the Committee is responsible for "[i]nterpreting the provisions of the Plan in all particulars." (J.A. at 240.) The Supplemental Plan was amended in December 2008 to be retroactively effective as of January 1, 2005 ("2008 Supplemental Plan") to include a stronger grant of discretionary authority to the Committee.

5

The COLA amendment therefore raised the abstruse question of whether to include the COLAs for Pension Plan lump sum payments in Factor $B$ (which reflects Pension Plan benefits) of the Supplemental Plan benefits formula ($A$ - $B$) when there is no corresponding COLA included in Factor $A$ and when a recipient chooses a lump sum payment. The Committee answered "yes" to that question and interpreted the Supplemental Plan to require the inclusion of COLAs in Factor $B$. In its review of the plan, the Committee determined that the total amount of retirement benefits promised to retirees would remain the same if the COLA were included in Factor $B$. According to the Committee, although benefits paid under the Supplemental Plan would decrease (under the $A - B$ formula), Pension Plan benefits would increase by the same amount pursuant to the COLA. The Committee explained that, although the Supplemental Plan benefits were reduced by the amount of the COLA in Factor $B$, the total Pension Plan benefits were increased by the same amount, such that Appellees' total retirement benefits (Pension Plan benefits + Supplemental Plan benefits) remained constant.[6]

---

[6] Our dissenting colleague takes issue with the Committee's interpretation because Appellees' benefits remained the same after a COLA was added, saying, "there is no perceived or actual benefit to Appellees as a result of the COLA Amendment under this scenario." (Dissent Op. at 5 n.6.) The dissent further asks "[w]hy would Appellees contract for such an illusory COLA benefit?" (*Id*. at 5.) These comments indicate a misunderstanding about the nature of the benefit plans at issue. The Appellees in fact did receive the benefit of the COLA under the Pension Plan. The fact that the Supplemental Plan is calculated in such a way that it decreases if the Pension Plan increases is the result of contract language. The Appellees never contracted for a COLA increase under the Supplemental Plan because a lump sum payment under the Supplemental Plan has never included a COLA adjustment. (J.A. at 234 (The 1999 plan stating that for "[a] lump sum payment which is the Actuarial Equivalent of the Participant's Retirement Income expressed as a life annuity … the cost-of-living benefit described in Article XI is not available."; J.A. at 277 (The 2005 plan COLA section, Section 9, stating "[n]o cost-of-

On February 8, 2010, the Appellees filed a complaint in the United States District Court for the Eastern District of Pennsylvania, contending that "defendants incorrectly decided that the addition of COLAs to pension plan lump sums would reduce the corresponding top hat lump sums by the same amount." (J.A. at 8 (summarizing the parties' dispute).) The Committee then filed a counterclaim against Zebrowski for overpayments he allegedly received under the Supplemental Plan.[7] The Committee moved to dismiss the complaint for failure to state a claim, and the motion was denied. The Committee then moved for summary judgment on both the complaint and the counterclaim, and the Appellees cross-moved for partial summary judgment on liability for pension benefits under ERISA, violations of ERISA's anti-cutback rule, breach of fiduciary duties under ERISA, and "other appropriate equitable relief" under ERISA. (*Id.* at 13.)

The District Court denied summary judgment to the Committee and granted the Appellees' motion as to liability. The Court held that the Committee's interpretation was not "reasonably consistent with the clear and unambiguous terms of the plans." (*Id.* at

living adjustment shall be provided under this Section with respect to any benefit paid in the lump sum form.").)

[7] Zebrowski retired in 2006, before the Pension Plan COLA amendment, but the amendment was applied retroactively to allow COLAs for lump sum benefits earned before December 2008, so Zebrowski was entitled to additional payments for past Pension Plan COLAs. On February 27, 2009, Evonik sent Zebrowski a letter stating that he had received a Supplemental Plan overpayment in the same amount as his Pension Plan COLA increase under the Committee's interpretation of the Supplemental Plan. In addition, there were certain tax consequences based on the payments, and Zebrowski was given two options to manage the tax issues. He refused both options and submitted an administrative benefit claim. His claim was denied, and he filed suit.

35.)  It also concluded that the Committee had breached its fiduciary duties and that the Committee's interpretation "constructively amended" the pension plan, such that, by including COLAs in Factor *B*, the Committee had reduced Pension Plan benefits in violation of ERISA's anti-cutback rule.  (*Id*. at 35-36.)  Later, the District Court calculated prejudgment interest using the investment approach each Appellee was following in 2009, a tax gross-up based on the negative tax consequences to the Appellees, and attorney's fees.  A final and appealable Amended Order and Judgment was entered on December 4, 2012.  This timely appeal followed.

## II.    Discussion[8]

The District Court did not apply the rule for top hat plans set forth in our decision in *Goldstein v. Johnson & Johnson*, 251 F.3d 433, 441-44, 448 (3d Cir. 2001).  Under *Goldstein*, a plan administrator's interpretations of ambiguous terms are given deference, subject to the covenant of good faith and fair dealing, if the plan in question includes a grant of discretionary authority.  *See id*. at 442-44.  The District Court held that the plan terms here were unambiguous and so it did not apply the *Goldstein* standard of deference

---

[8] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1332.  We have jurisdiction pursuant to 28 U.S.C. § 1291.  "We exercise plenary review of summary judgment and we apply the same standard that the lower court should have applied." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000).  "Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  In making this determination, we must consider the evidence in the record in the light most favorable to the nonmoving party." *Smith v. City of Allentown*, 589 F.3d 684, 689 (3d Cir. 2009) (citations omitted) (internal quotation marks omitted).

to the Committee's interpretation.[9] That was error, since there is both ambiguity and a grant of discretionary authority in the Supplemental Plan.

A. *Ambiguous Contract Terms*

Top hat plans are contracts "governed by general principles of federal common law." *In Re New Valley Corp.*, 89 F.3d 143, 149, 150-51 (3d Cir. 1996) (holding that top hat plans are unilateral contracts); *see also Kemmerer v. ICI Americas Inc.*, 70 F.3d 281, 287 (3d Cir. 1995) (noting that top hat plans are governed by "breach of contract principles, applied as a matter of federal common law"). If contract terms "are capable of more than one objectively reasonable interpretation, the words are ambiguous." *Baldwin v. Univ. of Pittsburg Med. Ctr.*, 636 F.3d 69, 76 (3d Cir. 2011).

In determining whether there is ambiguity, "[t]he strongest objective manifestation of intent is the language of the contract." *Id.* (citing *Mellon Bank, N.A. v. Aetna Bus. Credit Inc.*, 619 F.2d 1001, 1009 (3d Cir. 1980)) (finding ambiguity in pension plan term "children"). The District Court determined that the language dealing with Factor *B* "unambiguously and unmistakably refers to the [P]ension [P]lan" and, therefore, incorporates Article VI of the Pension Plan. (J.A. at 33.) According to the District Court, Article 6.1 provides a formula to calculate Pension Plan benefits that produces an annuity for Factor *B* which would not include the annual COLA. Even if the District Court's reading of Article 6.1 of the Pension Plan were correct – and we make no

---

[9] The District Court referenced *Goldstein* and the standard of review, but rested its analysis on its interpretation of the contract terms, which it held to be unambiguous. It appears that, in light of that holding, the Court determined that *Goldstein* was inapplicable.

comment on that reading – we disagree that Article 6.1 is plainly incorporated into the "Factor *B*" formula of the Supplemental Plan.

On the contrary, it is far from plain how, if at all, Article 6.1 affects the calculation of Factor *B*. Throughout the rest of the Supplemental Plan, when the drafters intended to incorporate a term from the Pension Plan, the section or article number of the Pension Plan was included with its capitalized title. For example:

> 2.11. "Benefit Service" means that part of a Participant's Service that is used to calculate benefits under the Plan and shall be determined in accordance with the provisions of **ARTICLE III – SERVICE CREDIT** of the Pension Plan and Article XIII of this Plan.

(*Id*. at 221.)

Supplemental Plan sections 2.36, 2.37, 13.2, and Article IV contain the same format for references to the Pension Plan. That format was not used in the "Factor *B*" language to reference terms of the Pension Plan. In fact, Factor *B* does not mention how Pension Plan benefits are to be calculated at all, let alone whether a COLA should be included. Because one can make a reasoned argument for both the District Court's reading and for the different reading given by the Committee, the pertinent provisions of the Supplemental Plan are, by definition, ambiguous. The District Court thus erred when it reached the contrary conclusion.

B.     *Grant of Discretion*

We have "routinely treated top hat plans differently from other kinds of plans." *Goldstein*, 251 F.3d at 436. They are considered to be "unilateral contracts, whereby neither party's interpretation is entitled to any more 'deference.'" *Id*. Under ordinary

10

contract principles, however, we give full effect to any provisions in a top hat plan that grant a plan administrator discretion to interpret ambiguous plan terms. *Id.* The administrator's interpretation is in all events subject to "de novo review as to whether a party has complied with its good-faith obligations." *Id*. at 444.

The "broad" grant of discretion in the top hat plan at issue in *Goldstein* gave the administrator "'sole authority' to '[i]nterpret the provisions' of the plan." *Id.* at 436. The Supplemental Plan at issue here grants a similar degree of discretion to the Committee. Article XV of the 1999 Supplemental Plan, at section 15.2.3, gives the Committee the authority to "[i]nterpret[] the provisions of the Plan in all particulars." (J.A. at 240.) Even if, as the Appellees argue, the 1999 version of the plan – not the 2008 version – is applied, the language of the 1999 Supplemental Plan is sufficient to establish the Committee's discretionary authority.[10]

Therefore, "the question presented to the Court is not whether [the Committee's] interpretation offers the best reading of the contract; rather, given the discretion granted to the [Committee], the question is whether the interpretation offered by [the Committee] was reached in good faith." *Goldstein*, 251 F.3d at 445. The District Court, in fact,

---

[10] We also disagree with the District Court's analysis regarding the vesting of benefits under the Supplemental Plan and its assertion that the Committee's argument regarding its discretion to interpret the plan was a "claim of discretion to nullify plaintiffs' entitlement to benefits" (J.A. at 29) that "reserve[d] a right to amend or terminate benefits after a participant's performance" (J.A. at 30). The interpretation at issue does not address vesting benefits under the Supplemental Plan; it addresses only the relative distribution of those vested benefits between the Supplemental Plan and the Pension Plan, *i.e.*, what the result of the formula $A - B$ is. Accordingly, the Committee's determination that COLAs are included in Pension Plan benefits under Factor $B$ is not a decision to terminate vested Supplemental Plan benefits.

11

concluded that the Committee did not act in bad faith, at least regarding the imposition of prejudgment interest. (J.A. at 46 ("[T]he record does not convincingly evince intentional bad faith or ill-motive on defendants' part.").) That factual determination is supported by the record, and there is no reason to believe there was anything less than good faith with respect to other aspects of the Committee's interpretive work or that the Committee did not "exercise [its] discretion reasonably." *Goldstein*, 251 F.3d at 444.

The dissent, on the other hand, concludes that the Committee's interpretation was unreasonable. (Dissent Op. at 10.) Our colleague's discussion of reasonableness, however, is flawed because it dismisses the attendant change in the law – *i.e.*, the *Williams* decision – that prompted the Committee's interpretation. Nor do we find persuasive an argument that the existence of other possible interpretations renders the Committee's decision unreasonable. That is a non sequitur. The dissent reviews reasonableness as if the Committee arbitrarily decided in 2008 to change the Supplemental Plan calculations. The Committee's interpretation of how the Supplemental Plan benefits were to be calculated, however, was based on the Pension Plan amendment, prompted by *Williams*[11], and the attendant complexity of the lump sum calculations. While the dissent's review of the record highlights the ambiguity of the contract here, that does not make the Committee's interpretation unreasonable.[12]

---

[11] The Dissent attempts to diminish the import of the *Williams* decision, but a Committee overseeing a federally regulated benefits plan should not be faulted for paying attention to the decision of a federal circuit court.

[12] The dissent relies on select examples of the Committee's "course of dealing" to come to the conclusion that the Committee's interpretation is unreasonable. (Dissent Op.

12

The record establishes that the Committee reached a reasonable interpretation of the Supplemental Plan, given the contract's inherent ambiguity and the calculations necessary under complex pension plans such as those before us. There is nothing

at 5.) But none of the record citations seems to us to be the "writing … on the wall" that the dissent believes them to be. (*Id*. at 10.) For the sake of completeness, however, we will review each here. First, the dissent highlights testimony that it claims confirms that "there was no … intent … to treat Supplemental Plan beneficiaries differently based on their elections … under the Pension Plan." (*Id*. at 6.) That seems to be a red herring. Under the terms of the Supplemental Plan, an annuity always allowed for a COLA. Thus, there was no conflict between the two plans because they both provided COLAs for annuity payments and so in fact treated beneficiaries the same. Second, the dissent quotes an actuary employed until 2006, who was not at the company when the *Williams* decision came out or when the COLA Amendment was passed. Despite emphasizing the importance of credibility determinations (*id*. at 2-3 n.3), the dissent relies on testimony of an employee – not referenced by the District Court itself – who was not present for the determinations relevant here. In response to this point, the Dissent notes that the next actuary testified that the Committee's interpretation was new. But the new interpretation of ambiguous contract language here, based on changed circumstances, is no smoking gun. Third, the dissent claims that internal resolutions show that the Committee changed its understanding of the Supplemental Plan. The dissent emphasizes that, in a resolution dated December 19, 2007, "the Committee wrote: '[n]on-qualified [Supplemental] plan benefits are reduced by qualified [Pension] plan benefits, *but are not linked to elections under the qualified [Pension] plan*.'" (*Id*. at 8 (quoting App. at 1550).) The dissent, however, could very well have emphasized the first half of the resolution, "[n]on-qualified [Supplemental] plan benefits are reduced by qualified [Pension] plan benefits," to make a very different point. It is reasonable to read the December 2007 resolution, as we do, as affirming that the formula A-B does not change based on a Pension Plan election. We do not think it is an "about-face" (*id*. at 9) to go from the simple statement that Supplemental Plan benefits are reduced by Pension Plan benefits, to the added language of Factor B that the Supplemental Plan benefits "shall reflect the relative value of the Participant's selected payment form under the Pension Plan." (*Id*. (quoting App. at 266).) These statements simply address the contours of the formula under which benefits are calculated.

As to the assertion that the contract language does not support the Committee's interpretation, the dissent cites to the deposition of the Director of Human Resources who testified that "[o]bviously, there was an interpretation of the plan which was contrary to the way *some of us* thought the plan *should* be interpreted." (J.A. at 1871 (emphasis added).) An internal dispute over contract terms – that we have already determined are ambiguous – does not indicate that the interpretation finally arrived at is unreasonable.

13

unreasonable about one interpretation over the other when the plan is "reasonably susceptible" to either meaning put forth by the parties. *Goldstein*, 251 F.3d at 447. As in *Goldstein*, we have looked to the Committee's substantive interpretation of the plan and conclude that there was "no inherent unreasonableness in the substantive interpretation" that would give rise to an "inference of bias or bad faith." *Id.*

We will accordingly reverse the District Court's order granting summary judgment to the Appellees because the terms of the Supplemental Plan are ambiguous and so are subject to the Committee's good faith interpretation.[13]

C.      *Breach of ERISA's Fiduciary and Anti-Cutback Provisions*

The Appellants also contend that the District Court erred in concluding both that the Committee breached its fiduciary duties and that the Committee had illegally decreased the Appellees' accrued benefits under ERISA Section 204(g). According to the Appellants, those claims have no place in this dispute over a top hat plan. They also argue that the District Court's reliance on *Battoni v. IBEW Local Union No. 102 Employee Pension Plan*, 594 F.3d 230 (3d Cir. 2010), was mistaken.

As a general matter, the administration and interpretation of an ERISA plan are "fiduciary acts." *Varity Corp. v. Howe*, 516 U.S. 489, 502-03 (1996). However, "it is well established … that there is no cause of action for breach of fiduciary duty involving

---

[13] The District Court's ruling on Appellants' counterclaim against Zebrowski and the award of prejudgment interest and a tax gross up for Appellees are foreclosed by our determination that the District Court erred in finding that the Committee impermissibly denied benefits owed under ERISA. Thus, they too are reversed, consistent with this opinion.

14

a top hat plan." *Goldstein*, 251 F.3d at 443. ERISA also contains an anti-cutback provision, pursuant to which "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082(d)(2) or 1441." 29 U.S.C. § 1054(g)(1). But top hat plans are exempt from ERISA's substantive vesting rules, including the anti-cutback provision. *Se*e 29 U.S.C. §§ 1051(2), 1101(a)(1); *Miller v. Eichleay Eng'rs, Inc.*, 886 F.2d 30, 34 n.8 (3d Cir. 1989). Appellees nevertheless rely on *Battoni* and contend that the ordinary fiduciary duty and anti-cutback rules apply because the plans at issue in this case are so interconnected that the Committee's interpretation of the Supplemental Plan was an amendment that effectively reduced benefits under the Pension Plan.

The District Court rejected the Appellants' argument that the plans are separate because it believed that the Committee "gave with one hand" and "took away with the other" when it increased Pension Plan lump sum payments by the COLA but decreased Supplemental Plan lump sum payments by the same amount. (J.A. at 36.) We disagree.

First, and foremost, our analysis hinges on whether the two plans are, as the Appellants argue, two separate plans, or are so intertwined that, as the Appellees say, the statutory protections of ERISA should apply when ordinarily they would not. Looking at the terms of the plans themselves and the separate provisions under ERISA that apply to each plan, we conclude that the plans are indeed separate and distinct. As discussed above, the instances where the Supplemental Plan incorporates the Pension Plan are clearly defined in a way that indicates the drafters' intent not to entirely read one plan into the other. Moreover, if we were to hold as the District Court did, ERISA's specific

15

top hat rules would be substantially undermined because statutory provisions pertaining to regular pension plans could regularly be read into top hat plans, contrary to Congress's intent to provide fewer protections for top hat beneficiaries. *See* Department of Labor Office of Pension & Welfare Benefit Programs, Opinion 90-14A, 1990 WL 123933, at *1 (May 8, 1990) (Department of Labor opinion noting that certain employees have the ability to negotiate their benefit plans and, as such, do not need more substantive protections); s*ee also Goldstein*, 251 F. 3d at 442 (citing Department of Labor opinion).

Nor do we think *Batton*i is applicable here. Again, ERISA's anti-cutback and fiduciary provisions do not apply to top hat plans. 29 U.S.C. §§ 1051(2), 1101(a)(1). Because the plans are separate, the Committee's interpretation of the Supplemental Plan, which is a top hat plan, does not effect a cutback of the Pension Plan. Even if *Battoni* were relevant, however, it would not aid the Appellees. That case requires a party making an anti-cutback claim to "show (1) that a plan was amended, and (2) that the amendment decreased an accrued benefit." *Battoni*, 594 F.3d at 233. The Appellees cannot establish either of those elements. There was no "amendment," either constructive or otherwise, when the Committee interpreted the plan, and the Appellees' benefits were not decreased because they received the COLA owed to them under the Pension Plan. In short, there was no cutback.

## III.    Conclusion

For the foregoing reasons, we will reverse the judgment of the District Court.

16

GREENAWAY, JR., *Circuit Judge*, dissenting

## I.  Introduction

In its effort to resolve this matter, the majority comes to an interpretation of the contract at hand that is untenable and yields an unjust result.  Thus, I am compelled to respectfully dissent.

First, the Committee's contract interpretation, which the majority adopts, enables Appellants to give with one hand and take with another, leaving Appellees with no net COLA entitlement.  This result is the essence of my disagreement with my colleagues.

Second, the Committee's contract interpretation is inconsistent with its own employees' testimony and contradicts its own internal documents.  Under the most deferential of standards—which our *Goldstein* standard is not—the Committee's contract interpretation does not fall within the realm of reasonableness.

## II.  The Committee's Interpretation Leaves Appellees With No Net COLA Entitlement

The majority accepts Appellants' claim that, when a *Pension Plan* beneficiary elects to receive his Pension Plan benefit as a lump sum payment, rather than in monthly annuity payments, the *Pension Plan* beneficiary is entitled to receive a COLA amount in addition to his lump sum payment—but must also then have his *Supplemental Plan* benefits reduced by an amount equal to the COLA.  (*See* Appellants' Br. 22 ("Since Pension Plan benefits increased due to the Pension Plan COLA . . . Supplemental Plan

1

benefits correspondingly were reduced [by the COLA amount].").)[1]  This interpretation

is purportedly mandated to avoid a double payment of the COLA to Appellees; however,

in actuality, Appellants seek to give an amount equal to COLA with one set of benefits

and to subtract an amount equal to COLA from another set of benefits, resulting in a *net

zero COLA entitlement* for each Appellee.[2]  Even according some degree of deference to

the Committee's contract interpretation of Supplemental Plan terms,[3] the Committee's

contract interpretation here cannot be deemed reasonable.

---

[1] (*See also* App. 1785-86 ("Furthermore, we reduced the present value to ensure that the total value of Mr. Woodruff's Qualified [Pension] and Nonqualified [Supplemental] Plan benefits before the COLA enhancement to the lump sum on the Qualified Plan is retained."); App. 2011 (explaining that a participant "who elects to receive his [Pension] Plan benefit as a lump sum will have his [Supplemental] Plan benefit reduced to . . . reflect[] the COLA [received by the participant with] the lump sum [he received under] the [Pension] Plan"); App. 1988 (explaining that even after the COLA Amendment takes effect, "the total amount of your retirement benefit [under both the Pension Plan and Supplemental Plan] is unchanged" because the COLA Amendment only "shift[s] . . . benefits from the Non-Qualified Plan to the Qualified Plan").)

[2]  This result is troubling because a COLA is "an essential element of the normal retirement benefit" that "ensures that the retirement benefits will not diminish in real value over time." *Hickey v. Chicago Truck Drivers, Helpers and Warehouse Workers Union*, 980 F.2d 465, 468 (7th Cir. 1992); *see also Williams v. Rohm and Haas Pension Plan*, 497 F.3d 710, 711 (7th Cir. 2007) (explaining that "COLAs are commonly applied to [retirement benefits] in order to account for inflation").

[3] *Goldstein* does not require that we accord substantial deference to a plan administrator's interpretation.  It requires that we make an independent determination as to reasonableness and good faith based on "[o]rdinary contract principles" and the federal common law of contract.  *Goldstein v. Johnson & Johnson*, 251 F.3d 433, 444 (3d Cir. 2001).  This is no lax standard, which at least two sister circuits have had occasion to acknowledge.  *See, e.g.*, *Comrie v. IPSCO, Inc.*, 636 F.3d 839, 842 (7th Cir. 2011) (Easterbrook, J.) (stating that under *Goldstein*, "interpretations by a non-fiduciary [such as a plan administrator] *must be ignored, and that courts must make independent decisions, no matter what a plan's governing documents say*") (emphasis added); *id.* (stating that the standard should be "easier, not harder as *Goldstein* thought, to honor discretion-conferring clauses in contracts that govern the actions of non-fiduciaries");  *Craig v. Pillsbury Non-Qualified Pension Plan*, 458 F.3d 748, 752 (8th Cir. 2006) (applying the *Goldstein* standard and finding that the plan administrator's interpretation was unreasonable); *id.* (acknowledging that *Goldstein* does not call for a relaxation of the standard of review from de novo to abuse of discretion and that "de novo review does not . . . alter our analysis as much as it might appear at first blush").

In *Goldstein*, we stated that "*[i]t is axiomatic that we defer to a district court's credibility determinations.*" *Goldstein*, 251 F.3d at 436, 445 (emphasis added).  In this case, the District Court combed through the record and made credibility determinations—to which we must defer—that were *adverse* to Appellants.  The majority does not give deference to the District Court's adverse credibility determinations, which *Goldstein* requires.  On the other hand, the majority gives substantial deference to the Committee's interpretation, which *Goldstein* neither requires nor endorses.

2

Appellants argue, and Appellees do not dispute, that Appellees are not eligible for or due any COLA entitlement as an addition or adjunct to their Supplemental Plan benefit. As such, the Supplemental Plan benefit should remain constant both before levying a COLA entitlement with the Pension Plan benefit as well as after. If the result differs, as Appellees suggest, there lies the rub.

An example regarding this calculation may clarify the point.[4] Assume each Appellee is entitled to a $100 Pension Plan benefit and a $5 COLA amount. Assume the Supplemental Plan benefit formula equals (Factor A - Factor B) × Factor C, where Factor C equals one and Factor A equals 200.[5]

The parties do not dispute that, under this example, each Appellee should receive $105 in a Pension Plan lump sum payment ($100 Pension Plan benefit plus a $5 COLA amount). The parties do dispute how to calculate the Supplemental Plan benefit.

Using Appellees' interpretation, the $5 COLA amount is not added to Factor B. Thus, each Appellee's Supplemental Plan benefit equals Factor A - Factor B, or $200 - $100, which equals $100. Adding this Supplemental Plan benefit of $100 to the Pension Plan Benefit of $105, each Appellee ends up with $205. Hence, the pensioner would have, at the end of the day, a greater benefit after the levying of a Pension Plan COLA

---

[4] The numbers used for the example above are not meant to be proportional to the actual numbers in this case, but are used for illustrative purposes.

[5] Section 7.2.2 of the Supplemental Plan states: "The Basic Amount of Early Retirement Pension of a Participant who retires from the Company . . . on or after age 60 shall be one-twelfth of (A-B) × C." (App. 229.)

3

entitlement than before. Notably, the Supplemental Plan calculation is the same both before and after disbursing the Pension Plan COLA entitlement.

Using the Committee's interpretation, on the other hand, the $5 COLA amount *is* added to Factor B. Thus, each Appellee's Supplemental Plan benefit equals Factor A - Factor B, or $200 - $105, which equals $95. Adding this Supplemental Plan benefit of $95 to the Pension Plan Benefit of $105, Appellee ends up with $200.

Most importantly, under the Committee's interpretation, each Appellee would take home $200 at the end of the day whether or not there was a COLA entitlement disbursed with the Pension Plan benefit. Put another way, if each Appellee had *not* received a $5 COLA amount with his Pension Plan benefit, such that the Pension Plan benefit equaled $100 instead of $105, the Supplemental Plan benefit would equal $100 (Factor A - Factor B, or $200 - $100), and each Appellee would still receive only $200 from both plans.

Thus, the Committee's interpretation, in practical terms, appears flawed. Under the example presented above, there would be no reason for Appellees to even ask for a COLA amount with the Pension Plan benefit because—under the Committee's interpretation—each Appellee would receive the same $200—in combined Pension Plan and Supplemental Plan benefits—whether or not he had a COLA amount added to his Pension Plan benefit. Why would Appellees contract for such an illusory COLA benefit?[6]

---

[6] The actual numbers involved in this case comport with the example used here. Taking Appellee Zebrowski as an example, the Committee indicated, by letter dated May 6, 2009, that Appellee Zebrowski was entitled to $1,774,428 in combined benefits under both the Pension Plan and Supplemental Plan. However, if he were to collect the $461,775 COLA entitlement with his Pension Plan benefit, he must "repay the Supplemental Plan $461,775." (*See* App. 1992-97; *id.* at 1996 ("If you receive an additional lump sum payment from the Pension Plan

4

**III.** **The Committee's Interpretation Is Inconsistent With Its Prior Course of Dealing, The Testimony of Its Own Actuaries and Employees and Its Prior Interpretation of the Supplemental Plan Terms**

The parties' prior course of dealing confirms that before the 2008 COLA Amendment, no COLA amount was ever considered as part of Factor B, and the calculations for Factor A and Factor B under the Supplemental Plan were not dependent upon one's election under the Pension Plan. (*See, e.g.*, App. 34-35 (District Court opinion indicating that "the defendants acknowledge that the calculation of plaintiff's benefits departed from the longstanding administration of the plans"); *Teamsters Indus. Emps. Welfare Fund v. Rolls-Royce Motor Cars, Inc.*, 989 F.2d 132, 137 (3d Cir. 1993) (stating that the "past dealings of contracting parties pursuant to an agreement are probative of the parties' intent" and "[e]vidence of a course of conduct is particularly compelling when it occurs over a substantial time period"); *James v. Zurich-Am. Ins. Co. of Ill.*, 203 F.3d 250, 255 (3d Cir. 2000) ("[A] basic rule of contract construction is that '[a] contract must be interpreted in light of the meaning which the parties have accorded to it as evidenced by their conduct in its performance.'" (second alteration in original) (quoting *Capitol Bus Co. v. Blue Bird Coach Lines, Inc.*, 478 F.2d 556, 560 (3d Cir. 1973)); *In re New Valley Corp.*, 89 F.3d 143, 150 (3d Cir. 1996) ("Extrinsic evidence

---

of $461,775 [to account for your Pension Plan COLA entitlement], you must repay the Supplemental Plan $461,775."); *id.* at 1988 (stating that "[d]ue to the COLA Amendment, your Qualified Plan lump sum benefit . . . is increased by $461,774.88," which has the effect of "shift[ing] a portion ($461,774.88) of your total retirement benefit from the Non-Qualified to the Qualified Plan, such that "your total retirement benefit under the Qualified Plan and Non-Qualified Plan is not chang[ed]").) Again, the Committee's requirement that Appellee Zebrowski (and each of the other Appellees), receive a COLA entitlement under the Pension Plan in exchange for a reduction of his Supplemental Plan benefit in an amount equal to the COLA entitlement, leaves Appellee Zebrowski (and each of the other Appellees) with a net zero COLA entitlement. Moreover, there is no perceived or actual benefit to Appellees as a result of the COLA Amendment under this scenario.

5

[which we may consider in interpreting a contract] may include . . . the conduct of the parties that reflects their understanding of the contract's meaning.").)

William Dorcas, Director of Employee Benefits at Evonik Degussa, confirmed that historically, when a plan participant elected an annuity form of payment from the Pension Plan, there was no "extra adjustment" of the Supplemental Plan benefits to account for the COLA amount received together with the Pension Plan benefit. (App. 1781-82.) Now, under the Committee's new interpretation, when a plan participant elects a *lump sum* form of payment from the Pension Plan, there *will* be an adjustment—namely, a reduction—in the Supplemental Plan benefits to account for the COLA amount received together with the Pension Plan benefit. However, the formula set forth in the Supplemental Plan allows for no such distinction—ostensibly because there was no *ex ante* intent among the contracting parties to treat Supplemental Plan beneficiaries differently based on their elections (of annuity or lump sum payments) under the Pension Plan.[7]

Furthermore, Peter A. Fargo, the company's actuary until 2006,[8] stated that "it is my opinion that *the adjustments made by [Appellants]* to the lump sum payable to

---

[7] This point is separate from (though related to) the issue of whether Factor B includes a COLA. The point here is that, if it were always the parties' intent to treat different beneficiaries under the same Supplemental Plan differently based on whether or not they chose to receive Pension Plan payments via a lump sum rather than annuity payments, the Supplemental Plan contract language should reflect that differential treatment. The absence of any contract language speaking to this differential treatment supports a finding that the Committee's interpretation is unreasonable.

[8] Contrary to the majority's contention, (*see* Majority Op. 13 n.11), Fargo's testimony is relevant, even though he was not working for Appellants at the time that the COLA Amendment was implemented. Fargo was familiar with the 1999 Supplemental Plan terms from having administered and interpreted that plan while working for Appellants. Therefore, his testimony indicating that Appellants' new contract interpretation is inconsistent with the Supplemental Plan terms—with which he was intimately familiar from his prior period of employment with Appellants—is relevant. Additionally, the actuary employed by Appellants after Fargo, Blake Baietto, also gave

6

[Appellees] under the Evonic RohMax USA, Inc. Non-Qualified Pension Plan in the event that [they] elect a lump sum payment from the []Pension Plan *is not in accordance with the terms of either the Original Non-Qualified Pension Plan or the Amended Non-Qualified Pension Plan*." (*See id.* at 2027 (emphasis added).) "Specifically, the benefit calculated under Section 6.1(b) of the Amended Non-Qualified Pension Plan is not affected by the election of a lump sum benefit under the Pension Plan . . . ." (*Id.*)[9]

Moreover, the Committee's own documentation indicates, as recently as December 2007, that it did not tie the calculation of Supplemental Plan benefits to one's elections under the Pension Plan. In a Resolution signed by the Committee on December 19, 2007 (the "December 2007 Resolution"), the Committee wrote: "[n]on-qualified [Supplemental] plan benefits are reduced by qualified [Pension] plan benefits, *but are not linked to elections under the qualified [Pension] plan*." (App. 1550 (emphasis added).)[10]

---

testimony that supports Appellees' position. Baietto indicated that while he "*had never done it that way in the past*," he received guidance from the Committee and Appellants' lawyers to change his calculation methodology to include a COLA amount in the calculation of Factor B, which had the effect of awarding a COLA amount with Pension Plan benefits and subtracting an amount equal to the COLA from Supplemental Plan benefits. (App. 1708-09 (emphasis added).) Baietto, however, was not able to point to any language from the 1999 Supplemental Plan that supported this new interpretation and methodological change. (*Id.* at 1714-15.)

[9] (*See also id.* at 2025-26 ("[T]he value of the lump sum payment under the Original [Supplemental] Pension Plan is *not contingent upon* the form of payment [chosen] under the Pension Plan." (emphasis added).)

[10] The first part of the December 2007 Resolution's statement that "[n]on-qualified [Supplemental] plan benefits are reduced by qualified [Pension] plan benefits" does not support Appellants' position, notwithstanding the majority's pronouncement to the contrary. Essentially, this stands for the uncontroversial proposition—which neither party disputes—that Supplemental Plan benefits are reduced by some measure of Pension Plan benefits (though the parties do dispute which numbers to include in calculating that measure of Pension Plan benefits). The controversial part of the December 2007 Resolution statement that this dissent seeks to emphasize is the second half, which claims that Supplemental Plan benefit amounts "are not linked to elections under the qualified [Pension] plan." (App. 1550.) It is plain from the record that, notwithstanding the December 2007 Resolution's pronouncement, Appellants did begin to link Supplemental Plan benefits to elections under the Pension Plan. (*See, e.g.*, App. 1699-1701 (Blake Baietto, Appellants' actuary, indicating that despite the December 2007 Resolution, Appellee Woodruff's Supplemental Plan benefit was linked to Woodruff's election of a lump sum rather than annuity payments under the Pension Plan).)

7

This language indicates that at least until December 2007, the Committee itself did not believe that the formula set out in Section 7.2.2 of the Supplemental Plan called for treating the calculation of benefits differently depending on one's elections (to receive a lump sum or monthly annuity payments) under the Pension Plan.

One year later—after certain of Appellees' benefits had already vested and accrued under the Supplemental Plan—the Committee added language to Factor B which states the opposite of the December 2007 Resolution, namely that "the Participant's Basic Amount of Early Retirement Pension [under the Supplemental Plan] shall reflect the relative value of the Participant's selected payment form under the Pension Plan." (App. 266.) Despite the fact that this addition constitutes an about-face in the Committee's interpretation of the Supplemental Plan benefits formula, the Committee steadfastly maintains that the "restated document . . . signed in December of 2008 and its predecessor [Supplemental Plan] document are the same in terms of the formula to be applied to calculate the benefit." (App. 1554.) This pronouncement by the Committee is hard to reconcile on this record.

To the contrary, the record reflects that Thomas Ayres, the Committee's Chairman, explained that the new Supplemental Plan language was added "based on the conflicts that [Appellants] were having at the time in terms of the interpretation of the plan with the plan participants," ostensibly including Appellees in this case. (App. 1556-57.) And, the testimony of Joseph Sinclair, Evonik RohMax's Director of Human Resources, also undermines any finding that the contract language supports the

8

Committee's interpretation.  (*See* App. 1870 (disagreeing with Appellants' decision to "[o]ffset[] the COLA driven increase in the [Pension Plan] benefit with a decrease in the [Supplemental Plan] benefit" because this decision "seems contrary to the intent of the [Supplemental] plan . . . [and the] decrease in the nonqualified [Supplemental] benefit in effect diminishes the value of the bonuses.").)[11]  The writing is thus on the wall.[12]

The Committee's interpretation, which changed in 2008 to provide for linking one's benefits under the Supplemental Plan to his election under the Pension Plan—and which had the effect of providing a net zero COLA entitlement—is unreasonable given the testimony of Appellants' own employees, Appellants' prior course of dealing, and Appellants' own prior interpretations of the contract.[13]  Behind the smoke and mirrors—which Appellants seek to erect through reference to complex actuarial calculations—is a

---

[11] Furthermore, at oral argument, Appellants conceded that their revised Supplemental Plan language constituted a "math change" in prior Committee interpretations of the Supplemental Plan benefits calculation.

[12] The majority argues that Appellants did not "arbitrarily decide[] in 2008 to change their Supplemental Plan calculations" but changed their interpretation because of "the attendant change in the law—i.e., the *Williams* decision." (Majority Op. 12 ("Accordingly, the "Committee's *interpretation of how the Supplemental Plan benefits were to be calculated . . . was based on the Pension Plan amendment*, prompted by *Williams* . . ." (emphasis added).)  Reliance on *Williams* to justify the Committee's interpretation is troubling for several reasons.  First, the *Williams* decision applied only to Pension Plan benefits and did not affect the law relating to Supplemental Plan benefits.  Second, *Williams* constituted non-binding out-of-circuit precedent, which Appellants were not compelled to follow but *voluntarily* chose to follow.  Third, the Committee's interpretative change disrupted the parties' *ex ante* intentions, which had been reinforced by the parties' course of dealing in prior years.  (App. 34 (District Court opinion indicating that "the actions of the contracting parties were consistent with a mutual intention that pension plan COLAs would be paid once under the pension plan and would not be used to reduce benefits paid under the top hat plan").)

[13] *See, e.g.*, *Goldstein*, 251 F.3d at 436 (stating that where, as here, a top hat plan "grant[s] the plan administrator discretion to construe the terms of the plan," that discretion is "subject to the implied duty of good faith and fair dealing" embodied in ordinary contract principles) (citing Restatement (Second) of Contracts § 205); Restatement (Second) of Contracts § 205 cmt. e; (stating that the duty of good faith is "violated by dishonest conduct such as . . . asserting an interpretation contrary to one's own understanding"); *id.* at cmt. d (stating that while a "complete catalogue of types of bad faith is impossible . . . the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain . . . [and] abuse of a power to specify terms"); c*f. Frommert v. Conkright*, 738 F.3d 522, 531 (2d Cir. 2013) (stating that "the [plan administrator's] proposed offset produces an absurd . . . result and is therefore unreasonable").

9

bare, *ex post* attempt to deprive Appellees of the COLA amount to which they are entitled.[14] The majority should not give its imprimatur to such an attempt.

While, as the majority indicates, "[t]here is nothing unreasonable about one interpretation over the other when the plan is 'reasonably susceptible' to either meaning put forth by the parties," (*see* Majority Op. 13 (quoting *Goldstein v. Johnson & Johnson*, 251 F.3d 433, 447 (3d Cir. 2001))), in my view the Supplemental Plan language here is not reasonably susceptible to the Committee's interpretation. To reiterate, the Committee's interpretation leaves Appellees with no net COLA entitlement, treats Supplemental Plan beneficiaries differently depending on whether they elect to receive Pension Plan benefits in lump sum rather than annuity payments absent any contract language reflecting this differential treatment, and runs contrary to the understandings of Appellants' employees, Appellants' prior course of dealing and Appellants' prior interpretations of Supplemental Plan terms. For the reasons set forth above, I would affirm the District Court's judgment. Therefore, I dissent.

---

[14] It seems that Appellants were confounded by the thought of having to pay a COLA amount together with a lump sum Pension Plan benefit, pursuant to the 2008 COLA Amendment. To this point, Appellants admitted in a letter to Pension Plan participants that "[t]he financial impact of applying the COLA to lump sum payments is significant and well beyond the value of the pension benefit as originally intended." (App. 1970 (Pension Plan COLA Amendment Notice, Nov. 7, 2008).) By calculating Supplemental Plan benefits pursuant to the Committee's interpretation, however, Appellants are able to give with the left hand and take with the right, such that the economic loss that they would otherwise have suffered as a result of paying out COLAs together with lump sum Pension Plan benefits is entirely mitigated. (*See, e.g.*, App. 1716-17 (Appellants' actuary Blake Baietto stated that "Evonik and its counsel made the decision that the size of the pie, if you will, stays the same . . . [s]o if there is more benefit coming from the qualified [Pension] plan, that must be reflected in the determination of the nonqualified [Supplemental] plan" benefit).)

10