In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-2393

JOHN W. COMRIE,

*Plaintiff-Appellant*,

*v.*

IPSCO, INCORPORATED, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 C 3060—**John W. Darrah**, *Judge*.

ARGUED JANUARY 6, 2011—DECIDED FEBRUARY 18, 2011

Before EASTERBROOK, *Chief Judge*, and CUDAHY and
ROVNER, *Circuit Judges*.

EASTERBROOK, *Chief Judge*.   In 2005 IPSCO Enterprises,
Inc., established a supplemental pension plan for top
executives. This plan (the IPSCO Enterprises, Inc. U.S.
Supplemental Executive Retirement Plan, which the
parties call "the SERP" and we call "the Plan") offers
benefits exceeding those eligible for tax deferral under
the Internal Revenue Code. Known colloquially as top-

hat plans, such supplemental plans are unfunded (so there is no trust account; benefits come from the employer's coffers). *Feinberg v. RM Acquisition, LLC*, No. 10-1890 (7th Cir. Jan. 6, 2011), slip op. 2, describes a similar plan. IPSCO's Plan had two golden-parachute features. First, any executive whose employment is involuntarily terminated within two years of a change of control is eligible for benefits without regard to a cap that otherwise would apply. Second, the Plan defines "involuntary termination" as any material change in the executive's "position, reporting relationship, overall responsibilities or authority". A termination can be "involuntary" under this definition even if the executive quits to take a better offer elsewhere—or quits just to lock in the Plan's extra benefits.

In 2007 SSAB Svenskt Stål AB, a Swedish firm, acquired a controlling interest in IPSCO through a friendly transaction. John W. Comrie, IPSCO's Chief Legal Officer, was part of the negotiating team. Shortly after the transaction closed, IPSCO promoted Melanie Klebuc-Simes over Comrie and named her "Vice President and General Counsel." Comrie, who used to report to IPSCO's CEO, now reported to Klebuc-Simes. Comrie resigned and asked for his benefits under the Plan to be paid as a lump sum. IPSCO accepted Comrie's contention that he had been "involuntarily terminated" but did not accept his proposed calculation of benefits. The parties' positions are about $2.5 million apart, and the difference led to this litigation. (Comrie is entitled to benefits under other pension plans, including a §401(k) defined-contribution plan, but there's no disagreement about them.)

Benefits under the Plan are based on the number of years the executive has worked at IPSCO (about 27 for Comrie) times 2% of the executive's average compensation in the five years before departure. Comrie is entitled to an annual pension under the Plan worth about 54% of his compensation. The source of the disagreement between the parties is a clause in the Plan providing that a "bonus" is not included in compensation. The bulk of Comrie's income came in the form of stock options or other stock-linked payments. His best year was 2005, when his base pay was $140,000 and he received benefits worth $109,484 under the "Management Incentive Program" and $851,792 under the "Long-Term Incentive Plan." These are the amounts reported to the IRS on Comrie's W-2 form; he may have enjoyed other tax-deferred benefits, but he concedes that unless an amount was reported to the IRS in any given year it does not count as "compensation" for the purpose of the Plan. Comrie received cash payments expressly designated "bonuses"; he contends that these, and only these, are "bonuses" under the Plan. The committee administering the Plan, by contrast, concluded that all stock-linked compensation is a "bonus" under the Plan, even though for its own purposes IPSCO had not used the word "bonus" when dealing with executives' stock-linked payments.

The district court concluded that the Plan's decision must stand unless arbitrary or capricious, for the Plan expressly confers interpretive discretion on the administrative committee. After considering at some length the language of the Plan, the §401(k) plan, the Summary

Plan Description for the §401(k) plan, and the minutes of the Board meeting at which the Plan was adopted, the district judge concluded that the committee's decision was reasonable and entered summary judgment in defendants' favor. 2010 U.S. Dist. LEXIS 46988 (N.D. Ill. May 12, 2010). The judge also dismissed claims that Comrie presented under the law of Canada. We discuss those toward the end of this opinion.

Comrie asks us to disregard the language of the Plan that confers interpretive discretion on the administrative committee. He gives two reasons: that members of the committee labored under a conflict of interest, see *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105 (2008); *Marrs v. Motorola, Inc.*, 577 F.3d 783 (7th Cir. 2009), and that the administrator of a top-hat plan is not a "fiduciary" as ERISA (the Employee Retirement Income Security Act) uses that term. The first of these is backward. True, one could say that members of the committee will try to protect IPSCO's interests (the Plan is unfunded, after all), but the committee's members are in the same position as Comrie: most, if not all, are executives who have received some stock-linked benefits and would have been better off had they accepted Comrie's interpretation of the "bonus" exclusion; their interests are aligned with his. There is no reason to suspect that the decision against his position was based on anything other than an honest belief that stock-linked remuneration is a "bonus" as the Plan uses that word.

As for the fact that the administrator of a top-hat plan is not an ERISA fiduciary: One circuit has held that inter-

pretations by a non-fiduciary must be ignored, and that courts must make independent decisions, no matter what a plan's governing documents say. *Goldstein v. Johnson & Johnson*, 251 F.3d 433, 442–43 (3d Cir. 2001). Another has adopted an intermediate standard divorced from contractual language. *Craig v. Pillsbury Non-Qualified Pension Plan*, 458 F.3d 748, 752 (8th Cir. 2006). We don't get it. When the Supreme Court held in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), that judges presumptively make independent decisions (often, though misleadingly, called "*de novo* review", see *Krolnik v. Prudential Insurance Co.*, 570 F.3d 841, 843 (7th Cir. 2009)), about claims to benefits under ERISA, it derived this conclusion from an analogy to trust law. The Court understood trust law to call for a non-deferential judicial role. ERISA fiduciaries are like common-law trustees, the Justices thought, so judges normally should make independent decisions in ERISA litigation. In *Firestone*'s framework, deferential review is exceptional, authorized only when the contracts that establish the pension or welfare plan confer interpretive discretion in no uncertain terms. 489 U.S. at 111. See also, e.g., *Diaz v. Prudential Insurance Co.*, 424 F.3d 635 (7th Cir. 2005).

Under *Firestone*, fiduciary status leads to independent judicial decisions, unless the contract specifies otherwise. To hold, as *Goldstein* does, that non-fiduciary status *requires* independent judicial decisions, *despite* a contract, is to turn *Firestone* on its head. *Firestone* tells us that a contract conferring interpretive discretion must be respected, *even when* the decision is to be made by an ERISA fiduciary. It is easier, not harder as *Goldstein* thought, to

honor discretion-conferring clauses in contracts that govern the actions of non-fiduciaries.

What rule of federal law do such clauses violate? Neither *Craig* nor *Goldstein* identified one. When a federal statute such as ERISA does not specify a rule of decision, contracts govern—especially so when no fiduciary duty is in play. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432 (1999); *Lockheed Corp. v. Spink*, 517 U.S. 882 (1996); *Johnson v. Georgia-Pacific Corp.*, 19 F.3d 1184 (7th Cir. 1994). IPSCO was free to set benefits at 2% times years of service times top compensation; it was free to exclude bonuses from that base; a federal court would not dream of devising a different formula more favorable to employees. Just so with other contractual terms. This is why in *Olander v. Bucyrus-Erie Co.*, 187 F.3d 599, 607 (7th Cir. 1999), we applied deferential review to a decision under a top-hat plan that provided its administrator with interpretive discretion. Comrie asks us to overrule *Olander*, but for the reasons we have given we conclude that its approach is correct. We use deferential review today.

The Plan's administrators did not act arbitrarily or capriciously in concluding that stock-linked compensation is a form of bonus. In the business world, a "bonus" is understood to be a discretionary component of compensation. If Comrie had a contractual entitlement to a specific number of vested stock options annually, then he might have a persuasive argument that the stock-linked income, though variable (it depends on how IPSCO's stock fares in the market), was not a "bonus." But

at oral argument Comrie's lawyer told us that, although Comrie was entitled to *some* options, *how many* he received each year was discretionary. That makes the stock-linked income look like a bonus, just as the Plan concluded.

Comrie's principal argument to the contrary rests on language in the summary plan description of IPSCO's §401(k) pension plan. This document tells participants that contributions to that plan depend on their "compensation," which "includes your base salary, bonuses, incentive pay, overtime and commissions". By listing "bonuses" and "incentive pay" separately, Comrie maintains, IPSCO demonstrated that stock-linked income (a form of "incentive pay") is not a "bonus."

Defendants reply that the summary plan description for the §401(k) plan is irrelevant; why should a summary description of a *different* plan matter to the meaning of the word "bonus" in the senior executives' top-hat Plan? Comrie's answer is that the Plan refers to the §401(k) plan documents for the definition of "compensation," to which defendants rejoin that the question at hand is not what's in but what's out—and the top-hat Plan does *not* refer to the §401(k) plan for the definition of "bonus."

All this to-and-fro is unimportant in the end, because the separate mention of "bonuses" and "incentive pay" in the summary plan description is designed to reduce uncertainty by informing employees that the definition of "compensation" in the §401(k) plan is comprehensive; readers need not scratch their heads about what

is covered. Language designed to convey the broad scope of one plan does not help much when trying to decide the scope of exclusions from a different plan. Although the language of the summary plan description gave Comrie a talking point when pitching his case to the Plan's administrative committee, it did not compel the committee to accept Comrie's preferred inference.

The parties' briefs contain exhaustive analyses of other language in the Plan, the §401(k) plan, the minutes of the meetings at which these plans were adopted, and regulations issued by the IRS defining "compensation" for the purpose of tax-qualified pension plans. None of these directly answers the question at hand—the meaning of the word "bonus" in this Plan—though a court might find them helpful if making an independent decision. But that's not our role. It is enough to decide whether the Plan's administrators acted arbitrarily or capriciously. We've said enough to show that the answer is "no."

Now for Comrie's claims under Canadian law. Comrie originally joined IPSCO, Inc., in 1980 at its headquarters in Regina, Saskatchewan. He was then a Canadian citizen. When IPSCO decided to move its principal operations and headquarters to Lisle, Illinois, where its subsidiary IPSCO Enterprises already was located, Comrie immigrated in 1999 and eventually became a U.S. citizen. But before he left Canada, he says, he asked his superiors whether the move would affect his pension benefits. He was assured that it would not—that he would receive credit for all Canadian service, that his eventual pension would be at least as high as it would have been

had he remained in Canada, and that the security for payment would be at least as good. (The Canadian plan was secured by a letter of credit from a major bank.) Comrie accuses IPSCO of breaking these promises. He also contends that when his job ended in 2007 he should have received severance payments under Canadian law.

There are all sorts of problems with these contentions. The promises to which Comrie refers are oral, and it is hard to know at this remove whether he remembers them accurately (or, indeed, whether they were made at all). A corporation's principal lawyer should have known that he needed them in writing if they were to be enforceable when he retired or quit many years later. The district judge also observed that Comrie did not make claims under these promises until long after he had come to the United States, well after the five years that the judge thought to be the statute of limitations. And how could these promises matter to the interpretation and application of the Plan, which was not adopted until 2005, six years after Comrie relocated to the United States? (This is not a suit to enforce the Canadian pension plan or have benefits under the §401(k) plan adjusted in light of the Canadian plan. Cf. *Bandak v. Eli Lilly & Co. Retirement Plan*, 587 F.3d 798 (7th Cir. 2009).)

The severance-pay claim is especially weak, because Comrie's last employer was an Illinois firm, and Canada does not purport to require U.S. firms to make severance payments to U.S. citizens who quit their jobs in the United States. Indeed, Canada does not require severance pay for persons who quit Canadian jobs. See *Kornerup*

*v. Raytheon Canada Ltd.*, [2008] B.C.J. No. 1049, 2008 BCCA 241 at 11–12 (B.C. App. 2008). The golden-parachute features of IPSCO's Plan, which give an unusual defini-tion to the phrase "involuntarily terminated", are not part of Canadian law. Someone who resigns because he no longer reports directly to a firm's CEO is hard pressed to call that separation "involuntary," apart from the Plan's golden-parachute features. A new layer on the organization chart is some distance from "constructive discharge" under this nation's law, see *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141–43 (2004), and Comrie has not argued that Canadian law is different.

None of this matters, however, because Canadian law never enters the picture. Comrie tells us that he is suing directly under Canadian law, which (on his view) ERISA does not affect, because it preempts only state law. 29 U.S.C. §1144(a). But how would Canadian law become applicable? Comrie sued in a court of the United States, not a court of Canada. This nation applies its domestic employment-relations law to employment in the United States and foreign law to employment abroad. See *EEOC v. Arabian American Oil Co.*, 499 U.S. 244 (1991). The only way Canadian law could apply would be through abnormal choice-of-law rules. Federal choice-of-law principles point to ERISA, which doesn't help Comrie. And if his theory is that a federal forum sitting in Illinois should use state choice-of-law principles (since his claim does not rest on federal law), then the suit runs smack into §1144(a): Illinois law is preempted. ERISA contains a special rule for plans designed to benefit nonresident aliens, 29 U.S.C. §1003(b)(4), but Comrie

is not in that category and so is covered by both ERISA's substantive rules and its preemption clause. He does not contend that ERISA itself would enforce oral promises (it doesn't, see *Frahm v. Equitable Life Assurance Society*, 137 F.3d 955, 958 (7th Cir. 1998)) or require severance pay. Comrie has received all of his entitlements under the written Plan and is entitled to nothing else.

AFFIRMED