**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-1606**

JEFFREY PLOTNICK; JAMES C. KENNEDY, on behalf of themselves, individually, and on behalf of all others similarly situated,

Plaintiffs - Appellants,

v.

COMPUTER SCIENCES CORPORATION DEFERRED COMPENSATION PLAN FOR KEY EXECUTIVES; COMPUTER SCIENCES CORPORATION,

Defendants - Appellees.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. T. S. Ellis, III, Senior U.S. District Judge. (1:15-cv-01002-TSE-TCB)

Argued: September 13, 2017                    Decided: November 8, 2017

Before MOTZ, DUNCAN, and WYNN, Circuit Judges.

Affirmed by published opinion. Judge Duncan wrote the opinion, in which Judges Motz and Wynn joined.

**ARGUED:** Matthew W.H. Wessler, GUPTA WESSLER PLLC, Washington, D.C., for Appellants. Deborah Shannon Davidson, MORGAN, LEWIS & BOCKIUS LLP, Chicago, Illinois, for Appellees. **ON BRIEF:** R. Joseph Barton, Kira Hettinger, COHEN MILSTEIN SELLERS & TOLL PLLC, Washington, D.C.; Deepak Gupta, Rachel S.

Bloomekatz, GUPTA WESSLER PLLC, Washington, D.C., for Appellants.  Christopher A. Weals, MORGAN, LEWIS & BOCKIUS LLP, Washington, D.C., for Appellees.

———————

DUNCAN, Circuit Judge:

Plaintiffs-Appellants Jeffrey Plotnick and James Kennedy, former executives of Computer Sciences Corporation ("CSC"), brought claims under § 1132(a) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et. seq.*, as amended, alleging denial of benefits under their deferred executive compensation plan after a plan amendment changed the applicable crediting rate. Plotnick and Kennedy sought class certification on behalf of all retired plan participants affected by the amendment, and CSC moved for summary judgment. The district court denied class certification and granted summary judgment for CSC. For the reasons that follow, we affirm the district court.

I.

As select, highly compensated CSC executives, Plotnick and Kennedy were eligible to participate in the Computer Sciences Corporation Deferred Compensation Plan for Key Executives (the "Plan"). The Plan is a type of unfunded, deferred-compensation plan commonly known as a "top-hat plan," through which key executives could elect to forgo compensation during their employment in exchange for payments in retirement. *See* 29 U.S.C. § 1051(2).

Plan participants' deferrals accrue in a notational account, and the company makes payments to participants after their retirements from CSC's general assets. CSC applies a crediting rate to participants' notational account balances. In practice, CSC pegs the

3

crediting rate to a market-based valuation fund, though Plan documents do not require this. Furthermore, since the Plan is unfunded, CSC applies this crediting rate to calculate each participant's payout but need not invest actual assets in the correlating valuation fund. After retirement, Plan participants receive their deferred income, plus credits earned according to this crediting rate, via either a lump-sum payment or in annual payments over a predetermined number of years. If a participant decides to take annual payments, the Plan directs that CSC make these payments in "approximately equal annual installments." J.A. 412, 434.[1]

The Plan grants its administrator broad discretionary authority to delegate functions, to determine questions of eligibility, to interpret the Plan and any relevant facts for purpose of the administration of the Plan, and to conduct claims procedures. J.A. 415–16, 441. By its terms, the Plan also may be "wholly or partially amended by the [CSC] Board from time to time, in its sole and absolute discretion." J.A. 422, 448. The crediting rate, in particular, is explicitly "subject to amendment by the Board." J.A. 411, 432. However, the Plan cabins the Board's authority to amend by mandating that "no amendment shall decrease the amount of any . . . [participant's account] as of the effective date of such amendment." J.A. 422, 448.

---

[1] "J.A." refers to the Joint Appendix filed by the parties.

4

Plan documents do not distinguish between active-employee participants and retired participants. Rather, the Plan defines a participant as any key executive who elects to participate in the Plan and who has not yet received all benefits due under the Plan. The Plan also requires "uniform[] and consistent[]" administration with respect to all participants similarly situated. J.A. 416, 441.

Since the Plan's establishment in 1995, the Board twice amended the crediting rate. From the Plan's inception in 1995 until 2003, it used a crediting rate equal to 120% of the 120-month rolling average yield to maturity on 10-year U.S. Treasury Notes. After 2003, the Board changed the crediting rate to track the 120-month rolling average yield to maturity of the Merrill Lynch U.S. Corporates, A Rated, 15+ Years Index as of December 31 of the prior Plan year (the "Merrill Lynch Rate"). Application of this latter crediting rate generally gave Plan participants above-market yields on their deferred income and very low volatility. Furthermore, the method of calculating this crediting rate smoothed out market fluctuations and made annual payments predictable and even.

While using the Merrill Lynch Rate between 2003 and 2012, CSC calculated the amounts of most future annual payments before the first installment was ever paid. Because the Merrill Lynch Rate was so predictable, CSC divided a participant's account value by the number of total installments to be paid and amortized based on an estimate of the crediting rate derived from the most recent Merrill Lynch Rate. CSC paid an equal amount every year, until the final year's payout, which CSC adjusted to account for the actual performance of the Merrill Lynch Rate over the distribution period. This last

5

payment served as a "true up" and could be less than or greater than the payments for prior years. Thus, over the time that CSC used the Merrill Lynch Rate, the annual installments a participant received were not only "approximately equal" as required by the Plan, but they also were *actually* equal until the final payment that closed out the participant's account. This final "true-up" payment accounted for market volatility and would be higher or lower depending on the actual performance over the payment term of the valuation fund from which the Merrill Lynch Rate was derived.

In May 2012, the Board amended the crediting rate again (the "2012 Amendment"). In contrast to earlier crediting rates, the 2012 Amendment resulted in a more flexible crediting rate linked to a participant's selection of one (or more) of four valuation funds. The four valuation funds include a money-market fund, an S&P index fund, a core bond fund, and a target-date retirement fund. This system permits participants to choose crediting rates derived from valuation funds with characteristics that they value, whether that means low volatility, steady growth, or high earning potential. Each fund varies in its potential offerings of risk and reward, and participants can allocate funds in their notational accounts between or among the four valuation fund types in any combination. Participants can even choose to change their allocation mix daily. The 2012 Amendment took effect on January 1, 2013, and applied uniformly to all participants.

6

With the 2012 Amendment's expansion of choice comes the potential for volatility and risk, including the possibility of losing value in a participant's notational account.[2] Also, the lack of predictability in the crediting rates from year to year means that annual installment payments can no longer be made strictly equal, as they had been (at least prior to the final "true up" year) when the Merrill Lynch Rate applied. Because the valuation funds will rise and fall with the market--and because participants can now move funds at any time between valuation funds--CSC can no longer predict future payments with precision. Instead, *each year* CSC calculates a retired participant's notational account value and divides the total value by the number of annual payments still due to the participant to calculate the "approximately equal annual installment" to distribute that year. Because account values can change over time depending on the valuation fund(s) selected by the participant and their performance, this new system does not generate strictly equal payments from year to year.

Plotnick and Kennedy elected to participate in the Plan beginning in the 1990s. Plotnick retired in September 2012 with an account value of approximately $3.5 million, and Kennedy retired in March 2012 with an account value of approximately $4 million. Neither Plotnick's account nor Kennedy's account decreased in value at the time that the 2012 Amendment took effect.

---

[2] Accordingly, the 2012 Amendment also clarified that a participant's notational account would have gains *or losses* attributed to it by the application of the crediting rate.

On May 20, 2013, Plotnick and Kennedy each sent CSC a letter claiming benefits under the Plan. Each letter argued that: (1) the Plan was a unilateral contract that could not be amended after a participant's retirement; (2) the 2012 Amendment was invalid because the new crediting rates permitted participants' accounts to lose as well as gain value; (3) the 2012 Amendment was invalid because it did not use a 120-month rolling average, as the previous crediting rates had done, to smooth out market volatility; and (4) the new crediting rate violated the Plan's requirement that distributions be made in approximately equal annual installments. CSC denied both Appellants' claims for benefits on July 22, 2013.[3]

Plotnick filed a putative class-action suit under ERISA § 1132(a)[4] on January 15, 2014, in the U.S. District Court for the District of New Jersey, and the case was transferred to the U.S. District Court for the Eastern District of Virginia shortly thereafter. Kennedy intervened in January 2016.

On April 26, 2016, the district court denied Appellants' motion for class certification on adequacy grounds, noting the existence of "an actual conflict between the

---

[3] As the district court noted, CSC's denial was "*inter alia*, untimely," but Plotnick and Kennedy did not identify any way in which this untimeliness harmed them or indicated abuse of discretion. *See Plotnick v. Comput. Scis. Corp. Deferred Comp. Plan for Key Execs.*, 182 F. Supp. 3d. 573, 605 (E.D. Va. 2016).

[4] "Top-hat" plans are exempted from ERISA vesting, participation, and funding requirements, as well as fiduciary responsibilities, but these plans are not exempted from compliance with reporting, disclosure, administration, or enforcement provisions, including denial-of-benefits claims under § 1132(a). *See* 29 U.S.C. 1101–14, 1131–45.

interests of the named plaintiffs and certain class members for whom the 2012 Amendment is an economic benefit, not an economic injury." *Plotnick*, 182 F. Supp. 3d. at 589. The district court also granted summary judgment to CSC at that time, holding that the 2012 Amendment was valid and thus that Plotnick and Kennedy were not entitled to relief on their denial-of-benefits claim. *Id.* at 605. This appeal followed.[5]

## II.

Plotnick and Kennedy appeal both the district court's denial of class certification and grant of summary judgment in favor of CSC. We review the district court's grant of summary judgment. The first section that follows discusses the standard of review, which has generated some confusion among our sister circuits and to which we have not spoken. The next section considers the Appellants' arguments on the appropriateness of summary judgment. We reach the same conclusions as the district court, and thus we affirm.

Because affirmance of the district court's grant of summary judgment disposes of Plotnick and Kennedy's claims, we decline to address the district court's denial of class certification.

---

[5] Plotnick and Kennedy only appeal the district court's determination of class certification and summary judgment on their denial of benefits under ERISA. They do not appeal the district court's granting of summary judgment on other claims.

## A.

This court reviews appeals under ERISA "de novo, employing the same standards governing the district court's review of the plan administrator's decision." *Johnson v. Am. United Life Ins. Co.*, 716 F.3d 813, 819 (4th Cir. 2013) (quoting *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 629 (4th Cir. 2010)). Circuits have split over the standard of review that a district court should apply to a top-hat plan administrator's benefits decision, and this circuit has no binding authority on this issue.

In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), the Supreme Court set forth the standard of review for denial of benefits under ordinary ERISA plans. Under the *Firestone* standard, a court reviews challenges brought under ERISA § 1132(a) for denial of benefits "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115. For example, under the *Firestone* standard, if a benefit plan were to give discretion to its administrator or fiduciary to carry out an interpretative task, then the court would defer to that administrator or fiduciary's interpretation on that issue; but if not, the court would review the administrator or fiduciary's decision de novo.

Since top-hat plans involve non-fiduciary administrators, circuit courts have disagreed about whether the *Firestone* standard applies to a district court's review of these plans. The Third Circuit explained that since "a top hat plan is a unique animal

10

under ERISA's provisions," the ordinary *Firestone* standard did not apply. *Goldstein v. Johnson & Johnson*, 251 F.3d 433, 442 (3d Cir. 2001). Instead, the Third Circuit held that top-hat plans are to be "treated as unilateral contracts" and reviewed "de novo, according to the federal common law of contract" and without regard to whether administrative "discretion" is "explicitly written into" the top-hat plan. *Id.* at 443.

The Eighth Circuit adopted a similar unilateral-contract approach, but it noted that even under de novo review the court was required to "ultimately . . . determine whether the Plan's decision was reasonable." *Craig v. Pillsbury Non-Qualified Pension Plan*, 458 F.3d 748, 752 (8th Cir. 2006).

In contrast, the Seventh Circuit extended the logic of *Firestone* to top-hat plans, reasoning that "*Firestone* tells us that a contract conferring interpretive discretion must be respected, even when the decision is to be made by an ERISA fiduciary." *Comrie v. IPSCO, Inc.*, 636 F.3d 839, 842 (7th Cir. 2011). Since top-hat plans lack fiduciary administrators, "[i]t is easier, not harder . . . , to honor discretion-conferring clauses in contracts that govern the actions of [these] non-fiduciaries." *Id.*

The Ninth Circuit also applied the *Firestone* standard of review to top-hat plans but added an additional analysis for structural conflicts of interest when the plan administrator both determines eligibility for benefits and pays those benefits. *Sznewajs v. U.S. Bancorp Amended & Restated Supp. Benefits Plan*, 572 F.3d 727, 733 (9th Cir. 2009), *overruling on other grounds noted by Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 673–74 (9th Cir. 2011).

However, after considering each of these approaches to top-hat plans' standards of review, the First Circuit noted that, at least for cases in which the plan grants discretionary powers to its administrator, applying the *Firestone* standard (as opposed to a contract-based standard) creates a distinction without a difference. The First Circuit thus declined to decide which standard of review applied and proceeded with arbitrary-and-capricious review of the administrator's use of discretion. *Niebauer v. Crane & Co., Inc.*, 783 F.3d 914, 923–24 (1st Cir. 2015). The Second Circuit charted a similar course in an unpublished opinion, noting that it was unnecessary to determine the standard of review because, based on the facts in that case, "even making a *de novo* determination on the administrative record, we reach the same conclusion as did the Administrator." *See Am. Int'l Grp., Inc. Amended & Restated Exec. Severance Plan v. Guterman*, 496 F. App'x 149, 151 (2d Cir. 2012).

Here, the district court's discussion of the standard of review mirrored that of the First and Second Circuits. Because the Plan granted its administrators full discretion to interpret the Plan, the district court reasoned that, under *Firestone*, an abuse-of-discretion standard would apply. Meanwhile, under a contract-based approach, the district court would evaluate the administrators' determination by analyzing "whether the exercise of discretion was done in good faith, the touchstone of which is reasonableness." *Plotnick*, 182 F. Supp. 3d at 597. Furthermore, the district court noted that courts in this circuit applying *Firestone*'s abuse-of-discretion standard will not disturb discretionary decisions if they are "reasonable." *See id.* at 598 (quoting *Booth v. Wal-Mart Stores, Inc. Assocs.*

12

*Health & Welfare Plan*, 201 F.3d 335, 342 (4th Cir. 2000)). Thus, under *either* an abuse-of-discretion or a contract-based standard, a "reasonable" exercise of discretion would stand, essentially closing any rhetorical distance between the two competing standards of review.

The district court thus proceeded in its analysis without determining whether *Firestone* or contract-based principles would apply, asking instead simply: "Was the administrator's determination to deny plaintiffs' claims for benefits on the ground that the 2012 Amendment is valid a reasonable interpretation of the Plan?" *Id.* From here, the district court analyzed the reasonableness of the Plan administrator's interpretation under this circuit's eight *Booth* factors. *Id.* (citing *Helton v. AT&T*, 709 F.3d 343, 353 (4th Cir. 2013)). The district court held that under *any* standard of review, "CSC correctly interpreted the Plan as permitting the 2012 Amendment, and CSC's denial of plaintiffs' claims for benefits was therefore appropriate."[6] *Id.* at 600.

Because, on the facts presented here, we agree that the competing standards of review present a distinction without a difference, we decline to decide which standard of review applies. Instead, we proceed as the district court did and reach the same conclusions. Whether we proceed under a "reasonableness" inquiry, an abuse-of-discretion standard, or even de novo review, we agree that the 2012 Amendment and

---

[6] The district court also explained that it would reach the same conclusion under even pure de novo review. *Id.*

CSC's denial of benefits were valid. Accordingly, we are compelled to affirm the district court's grant of summary judgment to CSC.

B.

This court "applies the federal common law of contracts to interpret ERISA plans," *Ret. Comm. of DAK Ams. LLC v. Brewer*, 867 F.3d 471, 480 (4th Cir. 2017), and will enforce "the plain language of an ERISA plan . . . in accordance with its literal and natural meaning," *id.* (quoting *United McGill Corp. v. Stinnett*, 154 F.3d 168, 172 (4th Cir. 1998)). The district court considered both the procedural and substantive validity of the 2012 Amendment and determined that, under any standard of review, this amendment and CSC's denial of benefits were valid.[7]

On appeal, Plotnick and Kennedy focus on the alleged substantive invalidity of the 2012 Amendment. They argue that the Plan was a unilateral contract and that the post-retirement 2012 Amendment impermissibly rendered the Plan's promises "illusory." *See* Appellants' Br. at 28–47.

---

[7] As the district court noted, Plotnick and Kennedy failed to comply with the local rule of the district court requiring point-by-point responses to the opposing party's statement of asserted undisputed facts, and thus effectively admitted the procedural validity of the 2012 amendment. *Plotnick*, 182 F. Supp. 3d at 592 n.22. Nevertheless, the district court analyzed the procedural validity of the CSC Board's 2012 amendment under ERISA § 1132(a)(3) and independently found it valid. *Id.* at 592–93.

14

Plotnick and Kennedy principally challenge three features of the 2012 Amendment: (1) the change to the crediting rate; (2) the introduction of potential for risk and volatility into the Plan; and (3) variations in annual distributions, which Plotnick and Kennedy argue are no longer "approximately equal." We consider each in turn.

1.

First, regarding amendment of the crediting rate, a plain reading of the Plan permits the Board to change the crediting rate so long as the change does not decrease the value of a participant's notational account at the time of amendment. The Plan also generally requires that administration be uniform and consistent. The 2012 Amendment changed the crediting rate but did not decrease the value of any notational account at the time the amendment took effect and applied uniformly to all participants.

Under any standard of review, the Board amended the Plan in accordance with the Plan's plain text. Plotnick and Kennedy seek to characterize the 2012 Amendment as rendering the promises of the Plan illusory, but the Plan made no promise that the crediting rate would remain the same forever. Rather, the opposite was true; by its clear and unambiguous terms, the crediting rate was always "subject to amendment by the Board." J.A. 411, 432.

Furthermore, the Plan's plain language does not support treating the accounts of retired and active-employee participants differently. First, the Plan's definition of "participant" does not distinguish between retired and active employees, and thus we

15

decline to draw such a distinction in contravention of the text. Second, the Plan requires uniform administration of participants' accounts. Applying different rates to different participants based on their employment status would not achieve "uniform administration," and we are not persuaded that such dissimilar administration of participants' accounts is appropriate under the Plan's terms. Thus, the Board acted reasonably when it applied the 2012 Amendment uniformly to all participants, whether retired or still employed at CSC.

Plotnick and Kennedy point to no other limiting language in the Plan to support the idea that the Plan prohibited the 2012 Amendment. The Plan does not require, for example, that the Board use a 120-month rolling average feature in the crediting rate that it selects, nor does the Plan require that a crediting rate provide some minimum rate of return for participants. By its terms, the Plan explicitly permitted amendment of the crediting rate, the 2012 Amendment conformed to the Plan's requirements and limitations, and the change to the crediting rate did not render illusory any promised benefit under the Plan. Thus, under any standard of review, the change to the crediting rate was valid and reasonable.

2.

Next, with regard to the introduction of risk and volatility into the Plan, Plotnick and Kennedy seek to read into the Plan another guarantee that simply does not exist. As noted above, the Plan's textual requirements--that there be uniform administration of

16

participants' accounts and that amendments not reduce the value of these accounts at the time of amendment--limited the Board's discretion in meaningful ways. For example, CSC could not apply a *negative* crediting rate, because this would reduce the value of accounts at the time the amendment took effect. Furthermore, the Plan administrator could not exclude Appellants' accounts from the 2012 Amendment because this might violate the requirement of uniform administration.

But as noted above, the text of the Plan simply does not limit the Board's selection of a crediting rate in the way in which Plotnick and Kennedy argue. The relative level of risk or volatility in a crediting rate merely follows from the crediting rate that the Board selects, and the Plan places no limit on a crediting rate's exposure to market-based risk. Since the 2012 Amendment, one participant may choose to allocate funds in a way that maximizes potential account growth, while another participant can choose a crediting rate based on a single, low-volatility valuation fund. The effects of volatility are more evenly spread over the payment term because payments are calculated annually instead of in advance, but this simply means that the volatility that was once accounted for in the "true-up" period is now spread more equally across annual installments.

Thus, the Board's selection of new crediting rates in the 2012 Amendment with a different expected volatility did not violate the Plan's terms, regardless of the standard of review applied. Phrased differently, since the Plan made no promises about the levels of risk or volatility in the crediting rate, the 2012 Amendment could not render such a promise illusory.

17

3.

Third, with regard to the variation in annual distributions that the 2012 Amendment created, this court cannot offer the relief that Plotnick and Kennedy seek. Plotnick and Kennedy are correct that if a participant elected to receive annual payments, the Plan directs that CSC make payments in "approximately equal annual installments." *See* J.A. 412, 434. Before the 2012 Amendment, these "approximately equal" installments happened to be *actually* equal--at least until the last "true-up" payment, which accounted for volatility in the crediting rate over the account's payment term and thus was different in amount from the other annual payments. However, this predictable payment schedule was merely a derivative effect of the application of a crediting rate that pegged earnings in participants' notational accounts to a crediting rate associated with a valuation fund featuring very low volatility. By tracking a single, low-volatility valuation fund, the pre-2012 crediting rate smoothed out market fluctuations and accordingly allowed CSC to predict with greater accuracy what future payments would be due to participants.

Nevertheless, as explained above, Plotnick and Kennedy are not entitled to their preferred crediting rate in perpetuity. Before the 2012 Amendment, most participants' annual payments happened to be equal, but the Plan does not promise such precision. In fact, participants' last "true-up" payment had *never* been equal to the other payments over the payment term.

18

Since the 2012 Amendment, eligible participants' payments are no longer the same from year to year, but CSC still pays participants in "approximately equal annual installments." Because the new crediting rate introduced the potential for more market volatility into participants' notational accounts, CSC developed a process of dividing the amount in a retired participant's notational account in a given year by the number of years remaining under the Plan. By doing so, CSC achieves "approximately equal" annual payments to eligible participants. In practice, these payments cannot be strictly equal over time. CSC cannot predict the actual performance of an S&P index fund over a year's time, much less over a decade, and even if CSC attempted to predict future performance of a particular valuation fund, it still could not predict how a participant's allocation decisions across funds might influence future credited earnings or losses. Participants who select valuation funds with lower but steadier rates can expect similar annual installment payments, while participants who select riskier but possibly more rewarding valuation funds can expect greater variation from year to year. The new system cannot deliver more than "approximately equal" annual payments, yet this is all that the Plan requires.

The Plan grants the Board authority to amend the crediting rate, including by selecting a rate with more volatility than past rates. From here, the Plan requires only *approximate* equality in annual payments. We do not read the Plan's direction that payments be approximately equal as a mandate requiring that the Board select low-volatility crediting rates that assure *actually* equal payments over time. If the Plan

19

intended this effect, we would expect it to do so explicitly alongside its other clearly articulated limitations on the Board's amendment authority and not through a direction that payments be "approximately" equal.

Though Plotnick and Kennedy apparently preferred the predictability of payments that flowed from use of a low-volatility crediting rate pegged to a single valuation fund, the Plan does not promise that this system would remain in place. The current method of dividing the amount in a participant's notational account by the number of annual payments remaining to calculate an approximately equal annual installment is, at the very least, a reasonable interpretation of the Plan's requirements.

In sum, we find that--regardless of the standard of review applied--the 2012 Amendment is valid and does not render any contractual promise illusory. The Plan did not require the Board to select crediting rates with a particular mix of risk and reward, nor did the introduction of potential volatility breach any Plan provision. Thus, the derivate impact of volatility on the amount of participants' annual installment payments after retirement--which remain approximately equal, if not actually equal--also does not violate any Plan provision. Despite Plotnick and Kennedy's shared disappointment in the current scheme, CSC's denial of benefits did not represent an abuse of or unreasonable exercise of discretion. Thus, we conclude that summary judgment in CSC's favor was proper.

III.

20

For these reasons, the judgment of the district court is

*AFFIRMED.*